Bruce Scott McQUADE, Appellant,

v.

STATE of Alaska, Appellee.

Forrest U. Johnston, Appellant,

v.

State of Alaska, Appellee.

Nos. A–8754, A–8773.

Court of Appeals of Alaska.

March 10, 2006.

6. Alaska Crim. R. 11(h)(3).

7. Alaska Crim. R. 11(h)(4)(A).

8. *Hampel,* 911 P.2d at 524 (citations omitted).

Sharon Barr, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant Bruce Scott McQuade.

Herman G. Walker Jr., Law Offices of Linda A. Limón, Anchorage, for Appellant Forrest U. Johnston.

Terisia K. Chleborad, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and David W. Márquez, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

Bruce Scott McQuade and Forrest U. Johnston appeal their convictions for first-degree robbery. McQuade and Johnston contend that they were subjected to an illegal traffic stop, and that all evidence stemming from that traffic stop should be suppressed. For the reasons explained here, we conclude that the traffic stop was justified because the police had reasonable suspicion that McQuade's and Johnston's vehicle was fleeing from the scene of a just-committed robbery. We therefore affirm McQuade's and Johnston's convictions.

### Underlying facts

At 2:43 a.m. on September 6, 2002, a dispatcher with the Anchorage Police Department notified officers that a robbery had just taken place at the Williams gas station on Huffman Road, near the New Seward Highway. The suspect was described as a stocky white male, 5′6″ to 5′8″ tall, wearing dark blue sweat clothes and a heavy dark jacket, with a white cloth over his face. The dispatcher advised officers that this individual had used a "finger in [his] pocket" to imply possession of a gun. Because the store clerk told the police that the robber had departed on foot, the police dispatch did not contain a vehicle description.

The description of the robber and his *modus operandi* (*i.e.*, the robber's use of an implied gun) struck a chord with Police Sergeant Chris Sims. Sims had assisted in the investigation of a similar robbery at another gas station (the Chevron station located at the corner of Fireweed Lane and the New Seward Highway) one week earlier. This robbery remained unsolved. However, during the investigation of the Chevron robbery, a police dog had tracked the robber's scent

to a nearby parking lot, where the trail ended—thus leading the police to conclude that the robber had entered a waiting vehicle.

Based on the locations of the two robberies (gas stations situated along the New Seward Highway), and working under the assumption that the Williams robber had likewise fled to a waiting vehicle, Sergeant Sims concluded that the robbery suspect would likely be driving north on one of Anchorage's two main north-south arteries: Minnesota Drive or the New Seward Highway. Sims decided to set up an observation post on the Dowling Road overpass of the New Seward Highway, to watch for north-bound traffic.

Approximately five to six minutes after the robbery dispatch was broadcast, Sims positioned his car on the Dowling Road overpass. During the three to four minutes that followed, Sims observed fewer than ten cars pass by going north. Then a small sedan caught his attention. The car, which had been traveling at or near the speed limit, slowed down as it approached his patrol vehicle. Sims could see that the car had two occupants: two white males with closely shaved heads. These two men avoided looking at Sims, and neither of them was wearing a seatbelt.

Sims decided to follow this sedan. He pulled out into the left-hand lane of the highway, behind the sedan. His intention was to catch up to the sedan and more closely observe the car's occupants and their clothing.

But as the two cars (the sedan and the police patrol vehicle) approached the vicinity of the Tudor Road exit, the sedan suddenly "crossed [from the left-hand lane] over into the right[-hand] lane and then immediately [onto] the Tudor exit ramp." Sims later could not recall whether the sedan signaled this abrupt lane change, but he testified that, under the traffic laws, drivers are required to signal for at least 100 feet before changing lanes—and, here, the sedan crossed two lanes within that short distance.

Sims stated that he believed the driver of the sedan was trying to avoid him, and this behavior heightened his suspicions. However, despite the traffic violation (the failure to

properly signal the lane change and exit from the highway), Sims decided not to pull the car over immediately—because, at that point, he believed he "was dealing with something a lot more significant than just a traffic violation."

As the two cars exited the New Seward Highway onto Tudor Road, with the patrol car following the sedan, Sergeant Sims observed the passenger in the sedan moving around in his seat. Sergeant Sims radioed his dispatcher that he believed the sedan was involved in the Huffman Road gas station robbery, and that he was looking for a well-lit place to conduct a traffic stop.

At 2:56 a.m.—that is, thirteen minutes after the report of the robbery was broadcast—Sergeant Sims activated his emergency lights, called in the license plate number of the sedan, and conducted a traffic stop at the intersection of Tudor Road and Bragaw Street.

When Sims approached the driver's window, he noticed that the passenger (later identified as Bruce McQuade) was wearing dark blue sweat pants and a dark blue sweat top. In addition, there was a heavy black jacket lying on the back seat, and this jacket appeared to be covering some items. The driver of the sedan was identified as Forrest Johnston.

After seizing the sedan and obtaining a search warrant, the police searched the vehicle and found $60 in cash, including a distinctive $5 bill with an orange stain that the Williams store clerk had said was stolen during the robbery. The police also found two pairs of gloves, a hat, a white T-shirt, and a navy jacket.

After McQuade and Johnston were indicted for first-degree robbery,[1] they moved to suppress the evidence found in the sedan. McQuade and Johnston argued that Sergeant Sims had lacked reasonable suspicion to stop them as robbery suspects, and that he had lacked probable cause to stop them for a traffic violation. In addition, Johnston (but not McQuade) argued that the traffic stop was pretextual.

---

**1.** AS 11.41.500(a)(1).

In response to this suppression motion, the superior court—Judge Larry D. Card—held an evidentiary hearing to investigate McQuade's and Johnston's claims. Sergeant Sims was the sole witness at this hearing.

After hearing Sims's testimony, Judge Card denied the defendants' motion to suppress. Judge Card found that Sims had had a reasonable suspicion that the occupants of the car were involved in the Huffman Road gas station robbery. The judge also found that the driver of the sedan had committed a traffic infraction when he abruptly exited the New Seward Highway at the Tudor Road off-ramp.

*The traffic stop was based on reasonable suspicion that one or both of the occupants of the sedan were involved in the just-committed robbery*

■ As explained above, Judge Card found both that there was reasonable suspicion for the stop (based on the recent robbery) and that the stop was justified because the officer saw the driver of the sedan commit a traffic infraction.

With regard to the traffic infraction, it appears that Judge Card was correct. Under 13 AAC 02.200(a), a driver making a right turn must travel "as close as practicable to the right-hand curb or edge of the roadway" both during the approach to the turn and while executing the turn (except when a traffic-control device requires otherwise). According to Sergeant Sims's testimony, McQuade's and Johnston's sedan was traveling in the left-hand lane of the New Seward Highway, and then it veered suddenly across the right-hand lane and onto the Tudor Road exit ramp. This maneuver appears to have violated 13 AAC 02.200(a).

We acknowledge that, according to the record in this case, Sims did not subjectively rely on this traffic infraction when he stopped the sedan. But if Sims observed the driver of the sedan violating 13 AAC 02.200(a), it does not matter whether Sims subjectively relied on this rationale for the traffic stop. As the Court recognized in *Hamilton v. State*, 59 P.3d 760 (Alaska App. 2002), the State can "rely on an after-the-fact justification [for an investigative stop], so long as the facts known to the officers at the time of the ... stop [were] sufficient to establish the legal foundation for this justification." *Id.* at 764.

However, we are hesitant to definitively resolve the issue of whether the driver of the sedan (Johnston) violated 13 AAC 02.200(a); the parties do not discuss this particular traffic regulation in their briefs, and this regulation has not previously been construed in a published Alaska appellate decision.[2] Moreover, we conclude that we need not resolve this issue, because we agree with Judge Card's second rationale for upholding the traffic stop: Sims had reasonable suspicion that one or both of the occupants of the sedan were involved in the just-committed robbery.

■ Under Alaska's *Coleman* test, a police officer may perform an investigative stop— *i.e.*, temporarily detain a person for questioning—when the officer has a reasonable suspicion that imminent public danger exists or that serious harm to persons or property has recently occurred.[3] In this case, McQuade and Johnston concede that the crime of robbery qualifies as a sufficient harm to persons or property to satisfy the *Coleman* test. However, McQuade and Johnston argue that the police lacked reasonable suspicion that they—or rather, that the as-yet-unidentified occupants of the sedan—had anything to do with the just-committed robbery.

■ To satisfy the "reasonable suspicion" standard, an officer must have "some minimal level of objective justification for making

---

**2.** The sole reference to 13 AAC 02.200(a) in Alaska appellate decisions occurs in *Bruns v. State*, Alaska App. Memorandum Opinion No. 4690, p. 2; 2003 WL 1878981, *1 (April 16, 2003), where this Court held that a motorist violated this regulation by making a right-hand turn from the left-hand lane of the road.

**3.** *Coleman v. State*, 553 P.2d 40, 43 (Alaska 1976); *see also Waring v. State*, 670 P.2d 357, 365 (Alaska 1983); *Metzker v. State*, 658 P.2d 147, 149–50 (Alaska App.1983).

the stop".[4] This objective justification must be "something more than an inchoate and unparticularized suspicion or hunch".[5] The officer must be able to point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." [6]

Here, one could argue that Sergeant Sims began with just a hunch—the hunch that the person or persons who committed the robbery of the Chevron station one week earlier had just robbed the Williams station, and that the robbers would be driving away from the scene of the robbery to the north·,(i.e., toward the center of Anchorage) along one of the major north-south arteries.

However, events soon began to corroborate Sims's hunch. Traffic along the New Seward Highway was sparse at three o'clock in the morning, and McQuade's and Johnston's sedan passed by Sims's Dowling Road observation post approximately ten minutes after the robbery was reported—in other words, within the window of time during which one might expect the robbers to pass by. The sedan was occupied by two white males—which was consistent with the hypothesis that the sedan contained the robber (described by the store clerk as a white male) and a get-away driver.

The sedan slowed down as it passed Sims's patrol car—suggesting that the driver had seen the patrol car—but the two men in the sedan did not look at the patrol car (behavior that Sims found noteworthy). In addition, the two men were not wearing seat belts—a possible indication that they had gotten into the car in haste.

As we already described, as soon as the sedan went past, Sims pulled his patrol car onto the highway and began following the sedan as it traveled in the left-hand lane. Sims was preparing to pull alongside the sedan to get a better look at the driver and the passenger when the sedan abruptly left the highway, cutting across the right-hand lane and taking the Tudor Road exit ramp (the very next exit as one proceeds north from Dowling Road). Sims concluded that the driver of the sedan was attempting to avoid his scrutiny. Under the circumstances, this was a reasonable conclusion.

Sims followed the sedan up the exit ramp and then onto Tudor Road, headed east. Sims could see the passenger moving around in his seat. At this point, Sims advised his dispatcher that he believed the occupants of the sedan were involved in the robbery, and that he was preparing to stop the sedan as soon as he arrived at a well-lit location—which turned out to be the intersection of Tudor and Bragaw.

Based on the observations and circumstances we have just described, Sergeant Sims had "more than an inchoate and unparticularized suspicion or hunch" that the occupants of the sedan were involved in the robbery. The timing of the sedan's arrival at Sims's observation post on Dowling Road, the behavior of the driver and the passenger when they saw Sims and his patrol car, the sedan's ensuing abrupt departure from the highway, and the unusual movements of the passenger as Sims continued to follow the sedan eastward on Tudor, all combined to provide Sims with "specific and articulable facts" that, given the recent commission of a serious felony, warranted an investigative intrusion.

We therefore agree with Judge Card that the investigative stop in this case was lawful under the Coleman test. Judge Card properly denied McQuade's and Johnston's suppression motion.

## Conclusion

The judgements of the superior court are AFFIRMED.

4. In the Matter of J.A., 962 P.2d 173, 176 (Alaska 1998) (internal citations omitted).

5. Id.; see also Gutierres v. State, 793 P.2d 1078, 1080 (Alaska App.1990) ("A reasonable suspicion is one that has some factual foundation in the totality of the circumstances observed by the officer in light of the officer's knowledge.").

6. Waring v. State, 670 P.2d 357, 365 (Alaska 1983), quoting Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968).