STATE of Alaska, Petitioner,

v.

Michael MILLER, Respondent.

No. S–12483.

Supreme Court of Alaska.

May 8, 2009.

Tamara E. de Lucia, Assistant Attorney General, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for Petitioner.

Douglas O. Moody, Assistant Public Defender and Quinlan Steiner, Public Defender, Anchorage, for Respondent.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, CARPENETI, and WINFREE, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

A police officer, responding to a 911 call reporting a domestic dispute in the parking lot of a bar late at night, stopped a car leaving the lot that matched the description provided by the 911 caller. The driver, subsequently charged with failure to take a breath test, moved to suppress evidence discovered as a result of the investigative stop. The district court denied the motion to suppress and the driver was convicted. The court of appeals reversed. Because the district court properly found that the officer had an objective basis to believe that a crime had occurred or that one was imminent, we reverse the decision of the court of appeals and reinstate the driver's conviction.

## II. FACTS AND PROCEEDINGS

### A. Facts

On July 13, 2005, at approximately 12:30 a.m., a woman called emergency 911 to report that a man and a woman were fighting in the parking lot of Henry's Bar in Juneau. The caller clarified her statement that the couple was "fighting" by saying "not like physical punching, but like yelling, I mean fighting and pointing, and like waving of arms." She indicated that the man and woman were a couple or possibly siblings. The caller stated that the man was approximately a foot and a half taller than the woman, and further described each individual. The caller also indicated that the couple was standing in front of a white Subaru WRX with its doors open.

After receiving the 911 call the police dispatcher contacted Officer Keith Mickelson who was on patrol in the immediate area. The dispatcher reported to Officer Mickelson that there was a "verbal 10–16"—police code for a domestic dispute—occurring in the parking lot of Henry's Bar, and that the complaint involved a man and a woman arguing beside a white Subaru.

Officer Mickelson approached the parking lot in his vehicle within moments of receiving the call and observed the white Subaru parked in front of Henry's; he noted that people were getting into the Subaru. As he entered the parking lot the Subaru was already driving across the lot toward him. The two vehicles passed within eight to ten feet of each other. Officer Mickelson could see the driver, and could tell that there were two other individuals in the vehicle, but could not determine whether any occupants of the car had suffered any injuries or whether there was other evidence of violence.

The officer brought his vehicle behind the Subaru and turned his police lights on when the Subaru was stopped at the stop line at the exit from the parking lot. Officer Mickelson approached the vehicle and spoke with the driver, Michael Miller, through the Subaru's open window. Officer Mickelson asked Miller "what was going on" with the argument at Henry's Bar. When Officer Mickel-

son looked at the two female passengers they shook their heads in a gesture that the officer interpreted as an indication that everything was fine. Officer Mickelson, having noticed Miller's bloodshot, watery eyes, and having detected the smell of alcohol, turned his attention back to Miller. Miller was ultimately arrested and charged with driving under the influence, refusal to submit to a chemical test, and two counts of reckless endangerment.

## B. Proceedings

Miller filed a motion to suppress all evidence obtained as a result of Officer Mickelson's investigative stop, arguing that the officer lacked the reasonable suspicion necessary to justify the stop. The district court held an evidentiary hearing on the motion in September 2005. Officer Mickelson was the only witness to testify at the hearing. Recordings of the 911 call and the communication between the police dispatcher and Officer Mickelson were also played at the hearing.

At the conclusion of the hearing, District Court Judge Keith B. Levy made oral findings that Officer Mickelson had reasonable suspicion sufficient to justify the investigative stop and, accordingly, denied Miller's motion to suppress. Judge Levy expanded on his findings and conclusions in a written decision. He found that "[a]lthough Officer Mickelson did not observe the dispute personally, the information he had was sufficient to establish a substantial possibility that a domestic violence assault was occurring, had occurred, or was about to occur." Judge Levy also found that "the potential harm of domestic violence, when weighed against the intrusiveness of the investigatory stop in this case, is sufficient to justify the stop."

After Judge Levy issued his order denying the motion to suppress, the parties entered into a *Cooksey*[1] plea under which they recognized that the outcome of the motion to suppress was dispositive of the case and agreed to allow Miller to retain the right to appeal from the district court's denial of his motion to suppress. Miller pled guilty to refusal to submit to a breath test and the other charges were dropped.

Miller appealed the district court's denial of his motion to suppress. The court of appeals concluded that the stop was illegal because Officer Mickelson "had no objective basis to believe that the reported argument had led, or would lead, to a crime," and that the district court therefore erred in denying Miller's motion to suppress.[2] Accordingly, the court of appeals reversed Miller's conviction.[3] We granted the state's petition for hearing, and now reverse the decision of the court of appeals.

## III. STANDARD OF REVIEW

 We review a denial of a motion to suppress evidence in the light most favorable to upholding the trial court's ruling.[4] The trial court's findings of fact will not be disturbed unless they are clearly erroneous.[5] We independently determine whether the trial court's factual findings support its legal conclusions.[6]

## IV. DISCUSSION

**The Court of Appeals Erred in Holding that the District Court Should not Have Denied Miller's Motion To Suppress and in Reversing Miller's Conviction on That Basis.**

 The parties agree that Miller was subjected to an investigative stop.[7] The res-

1. *Cooksey v. State*, 524 P.2d 1251 (Alaska 1974); see also *Miles v. State*, 825 P.2d 904 (Alaska App.1992).

2. *Miller v. State*, 145 P.3d 627, 628, 630 (Alaska App.2006).

3. *Id.* at 630.

4. *State v. Joubert*, 20 P.3d 1115, 1118 (Alaska 2001) (citing *Castillo v. State*, 614 P.2d 756, 765–66 (Alaska 1980)).

5. *Id.* (citing *Chilton v. State*, 611 P.2d 53, 55 (Alaska 1980)).

6. *Id.* (citing *Troyer v. State*, 614 P.2d 313, 318 (Alaska 1980)).

7. *Miller*, 145 P.3d at 629.

olution of this case depends on whether the stop was legal. Under the standard that we set out in *Coleman v. State*,[8] a police officer in Alaska may conduct an investigative stop when the officer has "a reasonable suspicion that imminent public danger exists or serious harm to persons or property has recently occurred."[9] In order to satisfy the reasonable suspicion requirement, the officer must have "some minimal level of objective justification for making the stop."[10] The objective justification must be "something more than an inchoate and unparticularized suspicion or hunch."[11] The officer must be able to point to specific and articulable facts which, under the totality of the circumstances known to the officer and in light of the officer's experience, support making the stop.[12]

In evaluating whether a specific stop was legal, Alaska courts apply a balancing test that was first articulated in *State v. G.B.* by then-Chief Judge Bryner of the court of appeals.[13] The degree of threat to the public safety and the imminence of that threat (or the seriousness of an already committed crime and the recency of the crime), must be weighed against the strength of the officer's reasonable suspicion and the intrusiveness of the stop.[14] "A minimally intrusive stop based on solid information indicating that a crime is actually in progress or has just been completed may be justified under *Coleman* even when the crime itself is not a felony and involves harm that in other contexts might not seem particularly serious."[15]

Because the *Coleman* and *G.B.* inquiries must be conducted on the basis of the indi-vidual circumstances of each case,[16] we consider four questions: (1) How serious was the alleged crime to which the officer was responding? (2) How immediate was the alleged crime to the investigative stop? (3) How strong was the officer's reasonable suspicion? (4) How intrusive was the stop?[17] In carrying out this inquiry, we review the district court's denial of the motion to suppress in the light most favorable to upholding that decision.[18] We will uphold the trial court's findings of fact unless those findings are clearly erroneous.[19]

### 1. How serious was the alleged crime to which Officer Mickelson was responding?

The state argues that Officer Mickelson was responding to a reported crime, asserting that "the officer had a reason to believe that a domestic disturbance had taken place moments before he arrived at the scene." Miller disagrees, arguing that "[t]he 911 call did not provide any indication that a crime had occurred or was about to occur" because "arguing is not a crime." Judge Levy found that "Officer Mickelson knew that a domestic disturbance had taken place moments before he arrived on the scene." The court of appeals' conclusion that the investigative stop was illegal rested upon the court's determination that Officer Mickelson "had no objective basis for believing that a crime had occurred or that one was imminent" because Officer Mickelson was responding to a report

8. 553 P.2d 40 (Alaska 1976).

9. *Id.* at 46.

10. *McQuade v. State*, 130 P.3d 973, 976–77 (Alaska App.2006) (quoting *In the Matter of J.A.*, 962 P.2d 173, 176 (Alaska 1998)).

11. *Id.* (quoting *In the Matter of J.A.*, 962 P.2d at 176).

12. *Id.* (quoting *Waring v. State*, 670 P.2d 357, 365 (Alaska 1983)); *see also Gutierres v. State*, 793 P.2d 1078, 1080 (Alaska App.1990) (citing *United States v. Sokolow*, 490 U.S. 1, 8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)).

13. 769 P.2d 452, 455–56 (Alaska App.1989).

14. *Id.* at 456.

15. *Id.* (citing *Coleman v. State*, 553 P.2d 40 (Alaska 1976)).

16. *Id.* at 455.

17. *Id.* at 456 (holding that degree and imminence of threat to public safety must be balanced against strength of officer's reasonable suspicion and actual intrusiveness of investigative stop).

18. *State v. Joubert*, 20 P.3d 1115, 1118 (Alaska 2001).

19. *Id.* at 1118 (citing *Chilton v. State*, 611 P.2d 53, 55 (Alaska 1980)).

of an argument and "had no reason to infer that this was a domestic violence situation." [20]

The court of appeals failed to accord the district court's factual findings the deference to which they were entitled, and it did not consider the factual context in which Officer Mickelson acted. He was responding to a citizen's 911 call reporting to the dispatcher that a "couple" was "fighting," relayed to him as a domestic verbal dispute. Thus, the district court's finding that the officer was acting on information that a domestic disturbance had taken place only moments before he arrived was not clearly erroneous. Moreover, the court of appeals failed to recognize the danger that a report of a verbal domestic dispute portends. As Officer Mickelson testified, such a report may indicate something more serious and, in his experience, a verbal dispute always precedes a physical one. A study issued in September 2005 ranked Alaska first in the nation for the rate of intimate partner violence ending in homicide.[21] Nationally, for homicides in which the victim-to-offender relationship could be identified, ninety-two percent of female victims were murdered by someone they knew, and sixty-two percent were killed by husbands, ex-husbands, or boyfriends.[22]

■ In holding that the report of a verbal domestic argument did not provide reasonable suspicion to justify the stop of Miller's vehicle, the court of appeals determined that Officer Mickelson "had no reason to infer that this was a domestic violence situation: no violence had been reported, he had observed no violence, and he had no knowledge of the relationship of the people involved." [23] But as the state correctly points out, physical contact is not a necessary element of domestic violence or of assault in the fourth degree.

Alaska Statute 11.41.230(a)(3) states that a person commits the class A misdemeanor of assault in the fourth degree when "by words or other conduct that person recklessly places another person in fear of imminent physical injury." Under AS 18.66.990(3), "domestic violence" includes the commission or attempted commission "by a household member against another household member" of "a crime against the person under AS 11.41." The definition of "household member" under AS 18.66.990(5) is very broad, and includes, among others, adults or minors "who live together or who have lived together," "who are dating or who have dated," "who are engaged in or who have engaged in a sexual relationship," or "who are related to each other up to the fourth degree of consanguinity."

Here, Officer Mickelson understood that he was responding to a report of a "verbal 10–16"—or "verbal domestic dispute"—involving a man who was a foot and a half taller than the woman with whom he was arguing vociferously in a parking lot in the vicinity of a bar near closing time. The argument was sufficiently extreme to prompt a citizen's 911 call. The police dispatcher who communicated this information to Officer Mickelson had received the 911 call from a person who stated that a man and a woman—described by the caller as "a couple" or siblings [24]—were "fighting" in the parking lot, even though the fight involved no physical punching. Because domestic violence can include an incident in which an individual makes a verbal threat that places a partner or sibling in fear of imminent physical injury,[25] and because the 911 report suggested

---

**20.** *Miller v. State,* 145 P.3d 627, 630 (Alaska App.2006).

**21.** Violence Policy Center, When Men Murder Women: An Analysis of 2003 Homicide Data 5 (2005), www.vpc.org/studies/wmmw2005.pdf.

**22.** *Id.* at 3.

**23.** *Miller,* 145 P.3d at 630.

**24.** Miller emphasizes that "[t]he caller acknowledged to the dispatcher that she did not know

what relationship existed between the man and woman" and that "[t]he state never produced any evidence that the man and woman were in any sort of domestic relationship." Because the standard being applied here is "reasonable suspicion," (*see Coleman v. State,* 553 P.2d 40, 46 (Alaska 1976)) the actual relationship between the man and the woman matters less than the apparent relationship. The description provided by the caller could fit a number of the types of relationships whose members are defined as "household member[s]" under AS 18.66.990(5).

**25.** *See* AS 18.66.990(3), (5); AS 11.41.230(a)(3).

that all of those elements could have been present in this case, we conclude that it was reasonable for the police dispatcher to believe that a crime involving domestic violence had been committed, was being committed, or would soon be committed, and to convey this information to Officer Mickelson.

Miller attempts to downplay the risk of domestic violence—and therefore the severity of the alleged crime—by asserting that there was only "some small possibility that an assault would occur" given that most arguments "do not end in criminal activity." But most arguments do not lead to 911 calls by disinterested citizens. Miller also argues that the state is trying to "create an exception to the *Coleman* standard" whereby "the police could detain a citizen on nothing more than the anonymous allegation that they have engaged in a verbal argument with anyone who meets the extraordinarily broad statutory definition of 'household member' in AS [18.66.]990(5)." The state responds that "[b]ecause domestic violence crimes are so pervasive and yet so underreported, police must be encouraged to investigate all reports of domestic violence." The state is right: Alaska courts have repeatedly recognized the problem of domestic violence in Alaska, and the importance of "vigorously resist[ing]" complacency about the problem in the face of the "fact that domestic assaults are so commonplace, and that they typically occur in [private]."[26] It is also true that domestic disturbances have the potential to, and often

do, lead to injury and death of third persons.[27]

Miller also appears to suggest that the officer should have abandoned his investigation once he saw the couple enter the private vehicle because at that point he had not received sufficient information to suggest that a crime had occurred, or was occurring. The fact that the couple had moved from arguing in public to entering a private vehicle does not mean that domestic violence had not already occurred, or was not still occurring. Because the report that Officer Mickelson received from the dispatcher was consistent with a domestic violence situation, and because that particular crime is one that typically occurs in private, Officer Mickelson could reasonably believe that the crime was ongoing. This reasoning does not require, as Miller suggests, a departure from the *Coleman* standard, but rather involves a recognition of the continuing problem of domestic violence, and the state's responsibility in protecting against it.

The facts of this case, therefore, can be distinguished from the facts in *Jones v. State*,[28] relied on heavily by the court of appeals here. In *Jones,* the court of appeals held that a verbal argument alone is insufficient to justify a detention.[29] In that case, the police responded to a 911 call that reported an argument between a tenant and a landlord.[30] When the police separated the tenant and the landlord and began to question them individually about the dispute, the tenant—Jones—attempted to walk away from the officers.[31] The police moved to

---

**26.** *State v. Huletz*, 838 P.2d 1257, 1261 (Alaska App.1992); *see also Pickard v. State*, 965 P.2d 755, 761 (Alaska App.1998) ("Both the Alaska Legislature and this court have recognized that domestic violence ... represents a serious danger to its victims and a significant harm to society at large.").

**27.** *See State v. Alex*, 1JU–06–848 CR (Juneau Super. Ct.2006) and *State v. Smathers*, 1JU–06–849 CR (Juneau Super. Ct.2006) (domestic violence between couple in moving automobile led to head-on collision with second automobile, killing driver of second automobile). Empirical studies show that domestic violence calls consistently rank high in rate of injuries to responding officers. *See, e.g.,* Desmond Ellis, Alfred Choi, and Chris Blaus, *Injuries to Police Officers Attending Domestic Disturbances: An Empirical Study*, 35 CANADIAN JOURNAL OF CRIMINOLOGY, 149–68

(1993) (ranking domestic disturbance calls third in rate of injuries to responding police officers, after robbery and arresting/controlling/transporting suspects and prisoners). *See also* J. David Hirschel, Charles W. Dean, and Richard C. Lumb, *The Relative Contribution of Domestic Violence to Assault and Injury of Police Officers*, 11 JUSTICE QUARTERLY 99–117 (1994) (ranking domestic disturbance fourth among ten categories of police work in ratio of assaults to calls for service).

**28.** 11 P.3d 998 (Alaska App.2000).

**29.** *Id.* at 1000.

**30.** *Id.* at 999.

**31.** *Id.*

restrain Jones and, when he resisted, they handcuffed and searched him.[32] The court of appeals ultimately held that the cocaine that was recovered as a result of the search was inadmissible because the police "had no indication that Jones had assaulted the landlord or had committed any illegal act" and therefore had "no basis" for requiring Jones to remain at the scene.[33] In that case, unlike the present, the police had already separated the two individuals and one attempted to leave, thereby ending the danger that the argument could escalate and become violent. In contrast, in this case the parties who were involved in the argument had not been separated but had instead moved into a private vehicle where the dispute could continue or even escalate. It is also significant that Officer Mickelson had a stronger indication in this case that Miller had committed or was about to commit a crime because the 911 call provided information that could reasonably be regarded as a description of domestic violence involving assault in the fourth degree.

In sum, Officer Mickelson was responding to a situation that he could reasonably believe may have already satisfied, currently satisfied, or would soon satisfy all of the requirements for domestic violence involving assault in the fourth degree.

## 2. How immediate was the alleged crime to the investigative stop?

We have previously stated that the justification required for an investigative stop of a vehicle leaving the vicinity of a suspected crime may be lower than the justification required for a police officer to stop and question a person on foot because "in such a situation, if action is not immediately taken, there is not likely to be another chance."[34] In this case, after receiving the report from the police dispatcher of a "verbal domestic dispute" in the parking lot of Henry's Bar, Officer Mickelson, who was in the immediate area, headed towards the parking lot and observed the persons entering an automobile. As Officer Mickelson arrived in the parking lot, the vehicle was moving, "driving . . . across the parking lot." Officer Mickelson passed the Subaru and, from a distance of eight or ten feet, tried to see if anyone in the vehicle was injured or in need of assistance, but "couldn't really see into the car." Officer Mickelson made the investigative stop when the Subaru had reached the exit from the parking lot. Officer Mickelson stopped the vehicle, therefore, only seconds after receiving the call, only after eliminating any nonintrusive means of ascertaining the situation, and only when it appeared that there would be no other opportunities before the vehicle left the vicinity to determine whether the reported crime had occurred, was still occurring, or was about to occur. In short, the alleged crime was quite immediate to the investigative stop.

## 3. How strong was the officer's reasonable suspicion?

 Under the reasonable suspicion requirement, the officer must have "some minimal level of objective justification for making the stop."[35] The objective justification must be "something more than an inchoate and unparticularized suspicion or hunch."[36] The officer must be able to point to specific and articulable facts which, under the totality of the circumstances known to the officer and in light of the officer's experience, support making the stop.[37] In noting the difference between the "quantum of information" an officer must have in order to justify a stop compared to that needed in order to justify an arrest, the court of appeals has stated that in the case of an investigative stop "it will suffice that there exists a substantial

32. *Id.*

33. *Id.* at 1000.

34. *Coleman v. State,* 553 P.2d 40, 46 n. 19 (Alaska 1976).

35. *McQuade v. State,* 130 P.3d 973, 976–77 (Alaska App.2006) (quoting *In the Matter of J.A.,* 962 P.2d 173, 176 (Alaska 1998)).

36. *Id.* (quoting *In the Matter of J.A.,* 962 P.2d at 176).

37. *Id.* (quoting *Waring v. State,* 670 P.2d 357, 365 (Alaska 1983)); *see also Gutierres v. State,* 793 P.2d 1078, 1080 (Alaska App.1990) (citing *United States v. Sokolow,* 490 U.S. 1, 8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)).

*possibility* that criminal conduct has occurred, is occurring, or is about to occur." [38] And "relevant information known to a police dispatcher may be 'imputed' to a police officer who conducts an investigative stop and so may be considered for purposes of evaluating whether the stop was supported by a reasonable suspicion." [39]

Here, Officer Mickelson was responding to a report from the police dispatcher of "a verbal domestic [dispute] . . . at the end of the building in the parking lot near Henry's, and the call was that the subjects were standing near a white Subaru with the doors open." When Officer Mickelson came into view of the parking lot he observed the white Subaru "parked at Henry's, . . . and the people were getting in the Subaru." Officer Mickelson's decision to stop the vehicle, therefore, was based on the specific and articulable facts that he had received a report from his police dispatcher indicating that there was a domestic dispute involving individuals near a white Subaru at the parking lot of Henry's bar, and that when he arrived at the location he observed individuals entering into the white Subaru.

Additionally, Officer Mickelson interpreted the facts reported to him by the police dispatcher, along with his own observations, in the light of his own experience as a police officer.[40] Officer Mickelson testified that he had experience investigating domestic disputes and that in his experience "almost every domestic situation I've been involved with has started out verbally." Accordingly, even though the report of "fighting" described "not like physical punching, but like yelling, . . . fighting and pointing, and like waving of arms," and a "verbal domestic disturbance," Officer Mickelson's experience led him to believe that there was a substantial possibility that the dispute could escalate into physical violence, or may already have escalated.[41]

Miller argues that the information provided by the 911 caller could not support a reasonable suspicion because "the 911 call itself indicates that the caller did not have personal knowledge." But a review of the relevant law and the evidence in this case refutes that claim.

■ In Alaska, "[a] stop may be based upon an informant's tip, so long as there is reason to believe that the informant is credible and a basis for concluding that the information provided by the informant was based on personal knowledge." [42] The court of appeals has held that information provided by an anonymous caller can be sufficient to justify an investigative stop when the tip has some "indicia of reliability." [43]

Miller's assertion that the caller did not have personal knowledge is based on the fact that a third person can be heard on the recording of the 911 call providing the caller with the specific make and model of Miller's vehicle. On the recording of the 911 transcript, the caller identifies the vehicle as "a car with its doors open . . . a white one," and then, after another voice can be heard in the background, adds "I guess it's a white Subaru, its like newer, a WRX." Viewing the facts in the light most favorable to the party that prevailed at the trial court,[44] it is clear from the 911 transcript that the caller herself had observed the arguing couple and the vehicle but had not known the name of that particular make and model. It is also evident that the third party offered the specific

---

**38.** *State v. Moran*, 667 P.2d 734, 735–36 (Alaska App.1983) (emphasis in original).

**39.** *State v. Prater*, 958 P.2d 1110, 1110 (Alaska App.1998).

**40.** *See Gutierres*, 793 P.2d at 1080 ("A reasonable suspicion is one that has some factual foundation in the totality of the circumstances observed by the officer in light of the officer's knowledge.").

**41.** *See State v. Joubert*, 20 P.3d 1115, 1118 (Alaska 2001) ("We review a denial of a motion to suppress in the light most favorable to upholding the trial court's ruling."); *see also Moran*, 667

P.2d at 735–36 (stating that "substantial *possibility* that criminal conduct has occurred, is occurring, or is about to occur" is sufficient to justify investigative stop) (emphasis in original).

**42.** *Allen v. State*, 781 P.2d 992, 993–94 (Alaska App.1989).

**43.** *Effenbeck v. State*, 700 P.2d 811, 812 (Alaska App.1985).

**44.** *See Joubert*, 20 P.3d at 1118.

make and model to provide more detail to the police. The transcript of the 911 call does not show that the caller did not have personal knowledge of the events she was describing; it shows only that the caller was not familiar with the particular model of vehicle. In addition, some of the information relayed by the caller to the dispatcher and by the dispatcher to Officer Mickelson was immediately confirmed when the officer approached the location provided by the caller and observed the white Subaru with individuals entering the vehicle. The information provided by the 911 caller, therefore, was credible, and based on first-hand knowledge, and had indicia of reliability.

Because the 911 call was sufficiently credible, and because the information conveyed from the caller to the dispatcher described a verbal argument between a man and a woman involving pointing and arm waving, the police dispatcher had a reasonable basis for describing the incident to Officer Mickelson as a verbal domestic dispute.[45] And because Officer Mickelson personally observed the individuals described by the police dispatcher entering the Subaru, because a domestic assault may occur even in the absence of a physical attack, and because the officer's personal experience indicated that incidents of physical domestic violence usually begin as verbal domestic disputes, Officer Mickelson had a strong suspicion that he was responding to an incident where there was a substantial possibility that a crime had occurred, was occurring, or was about to occur. The court of appeals erred, therefore, in concluding that "Officer Mickelson ... had no objective basis for believing that a crime had occurred or that one was imminent."[46]

#### 4. How intrusive was the stop?

As noted, the parties agree that Miller was subjected to an investigative stop.[47] We have recognized that an investigative stop is an "intermediate response" "between an arrest based on probable cause and simply allowing a crime to occur," and is designed to enable the police "to determine [a suspicious individual's] identity or to maintain the status quo momentarily while obtaining more information."[48] Officer Mickelson testified that he made the investigative stop in this case in order to ask the driver "what was going on with the ... argument over at ... Henry's." Officer Mickelson posed that question to Miller, the driver of the vehicle, and he asked if everything was okay, looking at the female passengers as he did so. Officer Mickelson conducted this brief interview through the open window of the Subaru. The stop was minimally intrusive. It was only as Officer Mickelson ensured that no one in the vehicle required assistance as a result of the argument that his attention was drawn to the evidence that Miller was driving while intoxicated.

### Balancing the factors

Looked at in the light most favorable to upholding the trial judges' factual findings, the following picture emerges: Officer Mickelson made an investigative stop that involved brief questioning conducted through the window of the vehicle. This minimally intrusive investigative stop was based on the officer's reasonable suspicion that a crime of domestic violence had occurred, was still occurring, or was about to occur, and on his observation that the individuals involved in the dispute were leaving the vicinity. The description of the argument that was reported to the police dispatcher in the 911 call suggested the presence of all of the elements of domestic violence involving assault in the fourth degree: the caller described a couple engaged in a heated argument involving words and actions that had the potential to

---

**45.** See *State v. Prater*, 958 P.2d 1110, 1110 (Alaska App.1998) ("[R]elevant information known to a police dispatcher may be 'imputed' to a police officer who conducts an investigative stop and so may be considered for purposes of evaluating whether the stop was supported by a reasonable suspicion.").

**46.** *Miller v. State*, 145 P.3d 627, 630 (Alaska App.2006).

**47.** *Id.* at 629.

**48.** *Coleman v. State*, 553 P.2d 40, 45 (Alaska 1976) (quoting *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)).

place another person in fear of imminent physical injury.[49]

In *G.B.*, Chief Judge Bryner emphasized that *Coleman* is "ultimately rooted in common sense and practicality," and that courts must evaluate "the risk that an investigative stop based on mere suspicion may be used as a pretext to conduct a search for evidence. As indicated in *Coleman,* the fundamental inquiry in each case is whether 'a prompt investigation [was] required . . . as a matter of practical necessity.' " [50]

Here, there is no indication that the purpose of the investigative stop was to conduct a search for evidence that Miller was driving under the influence nor that Officer Mickelson's suspicion of domestic violence was a mere pretext. There is, however, ample evidence that a prompt investigation by Officer Mickelson was required as a matter of practical necessity in order to ascertain whether a domestic violence incident had occurred, or to prevent a domestic dispute from escalating into domestic violence.

On each of the four factors that a court must consider in determining the legality of an investigative stop—the seriousness of the alleged crime, the immediacy of the alleged crime to the investigative stop, the strength of the officer's reasonable suspicion, and the intrusiveness of the stop [51]—the facts of the present case support the legality of the stop at least as strongly, if not more strongly, than the facts at issue in *G.B.* where the court of appeals reversed the trial court's suppression order and allowed the admission of evidence gathered through an investigative stop.[52] First, the alleged crime in *G.B.* was an unspecified theft from a video store,[53] a property crime, whereas here the alleged crime involved potential domestic violence, a crime against persons. Second, in both *G.B.* and the present case, the officers made their respective investigative stops almost immediately after receiving the police dispatch.[54] In *G.B.*, however, the suspect was on foot,[55] and therefore likely to remain in the area,[56] whereas in the present case the suspect had entered his vehicle and was leaving the scene at the time the officer made the stop. Third, on the question of the officer's reasonable suspicion, in *G.B.* the officer stopped the suspect based on a physical description relayed by the police dispatcher and the suspect's presence in the general vicinity of the reported crime.[57] Here, the officer was given a description of the individuals involved in the argument, their vehicle, and their location in the parking lot, thus essentially eliminating the possibility that he would stop the wrong person. Fourth, on the intrusiveness of the stop, in *G.B.* the officer asked the suspect to enter his patrol car and, after recognizing the suspect's name as being associated with a recent trespass into another business, conducted a patdown search.[58] Here, the officer allowed the suspect to remain in his own vehicle while he asked two brief questions through the Subaru's open window, and only initiated the arrest when confronted with the driver's "bloodshot, watery eyes and the odor of alcohol." This favorable comparison between the facts of

---

**49.** *See* AS 18.66.990(3) (stating that "domestic violence" includes the commission or attempted commission "by a household member against another household member" of "a crime against the person under AS 11.41"); AS 11.41.230(a)(3) (stating that a person commits the class A misdemeanor of assault in the fourth degree when "by words or other conduct that person recklessly places another person in fear of imminent physical injury"). As for the persons to whom the domestic violence statutes apply, *see* AS 18.66.990(5) (defining "household members" for the purpose of domestic violence legislation as including adults or minors "who live together or who have lived together," "who are dating or who have dated," "who are engaged in or who have engaged in a sexual relationship," or "who are related to each other up to the fourth degree of consanguinity").

**50.** *State v. G.B.,* 769 P.2d 452, 456 (Alaska App. 1989) (quoting *Coleman,* 553 P.2d at 46).

**51.** *See id.*

**52.** *Id.* at 457.

**53.** *Id.* at 453.

**54.** *Id.*

**55.** *Id.* at 453–54.

**56.** *See supra* n. 34 and accompanying text.

**57.** *G.B.,* 769 P.2d at 453–54.

**58.** *Id.* at 454.

the two cases is further strengthened by the posture of the respective cases on appeal: the court of appeals in *G.B.* overturned the factual findings of the trial court,[59] while our decision today affirms the trial court's decision, including its factual findings.

Officer Mickelson was confronted with a difficult decision when he arrived at the scene and observed the individuals reported to have been involved in a domestic dispute leaving the vicinity in a vehicle. We hold that the trial court did not err in concluding that Officer Mickelson acted appropriately in taking the necessary and minimally intrusive step of stopping the vehicle based on his reasonable suspicion that there was a substantial possibility that the crime of domestic violence involving assault in the fourth degree had occurred, was occurring, or was about to occur.[60]

## V. CONCLUSION

We REVERSE the judgment of the court of appeals and REINSTATE Miller's conviction.

MATTHEWS, Justice, with whom, FABE, Chief Justice, joins, dissenting.

MATTHEWS, Justice, with whom FABE, Chief Justice, joins, dissenting.

The court of appeals applied a legal precept derived from its decision in *Jones v. State.*[1] The precept is that an argument, even a loud one, standing alone does not justify an investigative stop.[2] Under the Alaska Constitution, investigative stops are only permitted if the officer who makes the stop has reasonable suspicion that a serious crime is imminent or has recently been committed.[3] The court of appeals' principle seems well justified. Arguments are not crimes, much less serious ones, nor, absent sights or sounds indicating physical violence, are they closely associated with past recent or imminent future crimes. Loud and heated arguments are not infrequent in our society. Sometimes they break out between strangers. More often they involve acquaintances, couples, or parents and their children. But only rarely do they degenerate into physical assaults.

This case seems particularly apt for application of the court of appeals' precept. As the court observed:

> Officer Mickelson, like the officer in *Jones*, had no objective basis for believing that a crime had occurred or that one was imminent.... Officer Mickelson acknowledged that he had no reason to infer that this was a domestic violence situation: no violence had been reported, he had observed no violence, and he had no knowledge of the relationship of the people involved.[4]

I would add that when Officer Mickelson arrived at the place where the argument had taken place he could see that there were three adults (two women and a man) getting into the white Subaru, rather than two as had been reported. An imminent domestic

---

**59.** *Id.*

**60.** *See State v. Moran,* 667 P.2d 734, 735–36 (Alaska App.1983).

**1.** *See Miller v. State,* 145 P.3d 627, 629–30 (Alaska App.2006) (citing *Jones v. State,* 11 P.3d 998 (Alaska App.2000)).

**2.** There is case law in other jurisdictions supporting this principle. *See Van Patten v. State,* 16 Ark.App. 83, 697 S.W.2d 919, 920–21 (1985) (holding officer violated a defendant's Fourth Amendment rights by stopping a vehicle based on a report of a "loud party disturbance"). Other cases involving arguments that had not yet escalated to physical violence have included aggravating facts supporting a conclusion that reasonable suspicion existed. *See, e.g., Nelson v. State,* 252 Ga.App. 454, 556 S.E.2d 527, 529–30 (2001) (holding a stop was appropriate where a police officer saw the driver and passenger of a moving car fighting in a manner suggesting that "blows were about to be struck" and causing the vehicle to "drift[] in its lane," creating a danger to the public); *People v. Williams,* 159 A.D.2d 946, 947, 552 N.Y.S.2d 793 (1990) (holding there was reasonable suspicion to support a stop where the police observed a man and woman arguing and had received a report that the man had a gun); *Commonwealth v. Shine,* 784 A.2d 167, 172–73 (Pa.Super.2001) (holding stop was justified where police officer arrived on the scene of "what he perceived to be an escalating violent situation" after receiving a report that "two men were on the highway with guns").

**3.** *Coleman v. State,* 553 P.2d 40, 46 (Alaska 1976).

**4.** *Miller,* 145 P.3d at 630.

assault was particularly unlikely to spring from such a grouping, for experience tells us that domestic assaults between adults are most frequently one-on-one events.

The ongoing case law development process of the court of appeals should, over time, give concrete meaning to Alaska's constitutional search and seizure guarantees. In my view, today's opinion needlessly interferes with this process and fails to give sufficient weight to our constitutional protections. For these reasons I would either dismiss the State's petition as improvidently granted or affirm the decision of the court of appeals.