Eric Dale VAN BUREN, Appellant,

v.

STATE of Alaska, Appellee.

No. A-3487.

Court of Appeals of Alaska.

Jan. 3, 1992.

Christine Schleuss, Schleuss & McComas, Anchorage, for appellant.

John A. Scukanec, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS, J., and ANDREWS, Superior Court Judge.*

OPINION

BRYNER, Chief Judge.

Eric Dale Van Buren was charged with one count of misconduct involving a controlled substance in the third degree (possession of cocaine). Van Buren moved to suppress evidence seized from his residence pursuant to a warrant, which he contended had been issued without probable cause. After Superior Court Judge Mark C. Rowland denied the motion to suppress, Van Buren entered a plea of no contest, reserving his right to bring this appeal challenging the superior court's ruling. We affirm.

On August 11, 1989, Superior Court Judge Victor D. Carlson issued warrants authorizing the Alaska State Troopers to

---

* Sitting by assignment made pursuant to article    IV, section 16 of the Alaska Constitution.

search Van Buren's residence in Anchorage, as well as residences occupied by Kenneth Federico and Tomas Pousada–Gonzalez. The warrants were based on an affidavit submitted by Trooper Investigator William R. Gause, which Gause supplemented with live testimony before Judge Carlson.

Gause's affidavit focused on Federico and Gonzalez, implicating both men in an ongoing course of cocaine distribution in Anchorage. Gause began the affidavit by describing a series of controlled purchases of cocaine by an undercover informant from an individual named Mary Goudreau. The affidavit went on to relate circumstances indicating that Federico was Goudreau's source of supply for the cocaine. From there, the affidavit set forth information indicating Gonzalez's active involvement in large-scale cocaine trafficking in the Anchorage area. Then, the affidavit recited facts establishing a link between Gonzalez and Federico, indicating that Federico sold cocaine for Gonzalez.

The link between Gonzalez and Federico was made out chiefly through a five-month period of electronic surveillance by federal agents, who used pen registers and calling line identifiers to determine the sources and destinations of telephone calls to and from Gonzalez's apartment. The surveillance had been authorized by a separate federal court order.

According to Gause's affidavit, Gonzalez's apartment received 686 telephone calls during the five-month period of surveillance, 253 of which were from Federico's primary Anchorage residence. A handful of additional calls came from other residences maintained by Federico. The calls occurred at all hours of the day and night, most lasting only a short time, usually less than a minute—a circumstance that Gause, from his past experience, believed to be consistent with drug trafficking. In addition, forty-five of the calls to Gonzalez's residence had originated from twenty-five different pay telephones in the Anchorage area—another circumstance Gause believed to be indicative of drug trafficking.

Gause's affidavit mentioned Van Buren only once. The mention occurred in connection with information concerning Gonzalez's telephone activity and appeared toward the end of the affidavit:

Finally, your affiant has knowledge that, the Federal pen register indicates that GONZALEZ is without telephone activity during regular intervals. Most recently, from June 17 through June 19, 1989, there was no telephone activity from GONZALEZ' telephone, indicating that he might have been away from his home. The telephone activity resumed in the early morning hours of June 20, 1989, including an early morning telephone call to KENNETH FEDERICO, and ERIC VAN BUREN, one McCaw pager and one Person Page pager, pagers being a common means for drug dealers to communicate with one another. *This pattern occurred on other earlier occasions when GONZALEZ' telephone was inactive.* (Emphasis added.)

Gause provided additional evidence linking Van Buren to Gonzalez and Federico in his supplemental testimony before Judge Carlson at the warrant hearing. Gause initially testified about observations made by N–371, an undercover officer who had moved into Gonzalez's apartment building to "get close" to Gonzalez. According to Gause, at about 3:40 p.m. on August 10, the day before the warrant hearing, N–371 had seen Van Buren approach Gonzalez's apartment, carrying a shopping bag. Van Buren knocked and was admitted. He left the apartment about eight minutes later, without the shopping bag, and drove away from the building. Fifteen minutes later, N–371 saw Federico leave Gonzalez's apartment and drive away (N–371 apparently did not know when Federico entered the apartment). N–371 then left the area for a short time. Upon returning, at around 4:30 p.m., he noticed that Van Buren's car had again been parked in front of the apartment building. N–371 looked again at 5:10 p.m. and the car was no longer there.

After Gause finished telling Judge Carlson about N–371's observations, he provided the judge with updated information con-

cerning telephone activity at the Gonzalez apartment:

Q: The PEN registers and calling [indiscernible—away from mike] identified that are in place on Tomas Pousada–Gonzalez' telephone and Kenneth Federico's telephone. Have you updated information about those statistics which are actually listed in the affidavits?

A: Yes, the PEN register activity had been updated through some time around 8 o'clock this morning, the calling line identifier with incoming phone calls, had not been updated since approximately a week and a half ago and that's because it usually takes eight to ten days to obtain the information from the phone company.

Q: Okay, and what—how many telephone calls had Tomas Pousada–Gonzalez made to Eric Van Buren at this point in time?

A: He's made approximately 60 phone calls to Mr. Van Buren at his residence at 2221 Muldoon, space 500. He also made five phone calls to a pager which has been identified as belonging to Mr. Van Buren.

Q: Also at that address?

A: Yes. It comes back via—the information from—the subscriber information from the pager company that unit is [indiscernible—bad recording].

Q: And how many phone calls has Gonzalez now made to Federico's home phone number on Sun Crest Drive?

A: 72 phone calls. Approximately 72.

Gause went on to describe Van Buren's residence, and testified that Van Buren's car had been seen parked there that morning. Based on the foregoing information, Judge Carlson concluded that the state had established probable cause to search Van Buren's home. Execution of the warrant issued by Judge Carlson yielded the cocaine that resulted in Van Buren's conviction in this case.

Van Buren contends on appeal that the evidence presented to Judge Carlson did not amount to probable cause. He argues that the evidence included no direct proof of his involvement in drug trafficking, indicating at most a general association with Gonzalez. Moreover, Van Buren contends that the evidence established no nexus between his residence and any dealings that he might have had with Gonzalez.

■ We use the following standard to determine probable cause in this context:

> In evaluating a search warrant we view the evidence in the light most favorable to upholding the warrant and will only invalidate the warrant if the magistrate abused her discretion. Doubtful or marginal cases are resolved in favor of the warrant, and the evidence presented to the magistrate must be considered "in a reasonable and common sense manner."

*State v. Chapman*, 783 P.2d 771, 772 (Alaska App.1989) (citations omitted).[1]

Applying this standard to the totality of the evidence before Judge Carlson, we conclude that the judge did not abuse his discretion in deciding to authorize the search of Van Buren's residence.

■ The fact that the information relating to Van Buren was circumstantial and included no direct observations of drug-related transactions is beside the point:

> Probable cause to issue a search warrant exists when "reliable information is set forth in sufficient detail to warrant a reasonably prudent [person] in believing that a crime has been or was being committed."

---

1. Van Buren notes that Judge Rowland referred to the "clearly erroneous" standard of review in upholding Judge Carlson's decision to issue a search warrant. Van Buren argues that the clearly erroneous standard is unduly deferential and that Judge Rowland's reliance on it was unjustified. However, when this court considers the issue of probable cause for a warrant in an appeal in which there is no dispute as to the evidence presented to the issuing judge, our reviewing function is essentially identical to that of the court ruling on the motion to suppress at the trial level. *State v. Conway*, 711 P.2d 555, 557 (Alaska App.1985). Accordingly, any error by Judge Rowland in applying the clearly erroneous standard has no effect on this court's ruling.

*Badoino v. State,* 785 P.2d 39, 41 (Alaska App.1990) (quoting *Harrelson v. State,* 516 P.2d 390, 396 (Alaska 1973)). Regardless of whether the evidence offered in support of probable cause is direct or wholly inferential, the ultimate inquiry is the same:

> The magistrate is not required to determine whether *in fact* the items to be searched for are located at the premises to be searched, but only whether there is *reasonable ground* to believe they are there.

*Metler v. State,* 581 P.2d 669, 672 (Alaska 1978) (emphasis in original) (citation omitted) (quoting *United States v. Bowers,* 534 F.2d 186, 192 (9th Cir.1976)).

██ The evidence in this case connecting Van Buren to Gonzalez's and Federico's drug-selling activities, though circumstantial, was indicative of far more than a casual and legitimate association between an innocent person and persons separately engaged in illegal activities. *See, e.g., Sibron v. New York,* 392 U.S. 40, 62–63, 88 S.Ct. 1889, 1902–03, 20 L.Ed.2d 917 (1968) (defendant's mere presence in a bar during the execution of a search warrant did not establish probable cause to search the defendant's person). Here, the evidence tended to show Van Buren's integral involvement in the same illegal activities that Gonzalez and Federico were pursuing.

Gause's affidavit convincingly established that Gonzalez and Federico were involved in ongoing cocaine trafficking and that they relied heavily on the telephone to carry on their criminal enterprise. The affidavit also revealed that a distinctive pattern of telephone calls had emerged in the course of the federal surveillance: telephone activities at Gonzalez's apartment would cease altogether for intervals of several days and would thereafter resume with calls from Gonzalez's telephone to Federico's residence, Van Buren's residence, and two telephone pagers.[2]

██ Gause's testimony provided a further indication of Van Buren's involvement in Gonzalez's and Federico's criminal enterprise. According to Gause, in the one and one-half week period immediately preceding the warrant hearing, approximately sixty calls were placed from Gonzalez's apartment to Van Buren's residence, with five additional calls to a pager belonging to Van Buren. In the same period, approximately seventy-two calls were made to Federico's primary residence.[3]

Standing in isolation, the information concerning Van Buren's involvement in telephone traffic with Gonzalez's apartment might not amount to probable cause. However, against the strong backdrop of evidence showing Gonzalez's and Federico's ongoing involvement in drug trafficking and the pattern of telephone activity that emerged therefrom, the information about Van Buren's telephone communications provides a telling indication of his probable participation in the same illegal enterprise.

---

**2.** Gause's affidavit described the most recent occurrence as being between June 17 and 19. The affidavit did not specifically describe other occurrences, but stated, "[t]his pattern occurred on other earlier occasions when Gonzalez' telephone was inactive." In his brief and at oral argument, Van Buren has maintained that the affidavit's mention of calls to Federico and Van Buren was meant as a description of a single occurrence, and not as part of the "pattern" of calls described by Gause in the affidavit. Although Gause's affidavit might be interpreted in the manner suggested by Van Buren, it is also capable of being read to mean that the pattern of telephone activities included not only periodic interruption of calls from Gonzalez's residence but also the regular resumption of telephone activity by calls to Federico and Van Buren. Judge Carlson could reasonably have adopted the latter interpretation. The deference we owe to the issuing judge and our consequent duty to construe the evidence in the light most favorable to upholding the warrant require us to reject Van Buren's proposed reading of Gause's affidavit.

**3.** Van Buren contends that Gause did not specify that the sixty calls to Van Buren and seventy-two calls to Federico were made in the one and one-half weeks immediately before the warrant hearing. Van Buren reads Gause's testimony as indicating only that the calls were made at some time over the five-plus months of federal surveillance. However, a common sense reading of Gause's testimony would support the conclusion that Gause was describing calls occurring during the most recent, one and one-half week time period covered by Gause's update. Again, any ambiguity in this regard must be resolved in favor of upholding the warrant.

This evidence, in turn, was bolstered by Gause's testimony concerning Van Buren's comings and goings at Gonzalez's apartment the day before the search warrant hearing, as well as Gause's testimony that Van Buren apparently delivered a shopping bag to Gonzalez and that Federico emerged from Gonzalez's apartment a short time later. Again, this information was certainly not peculiarly significant in its own right, being in itself only marginally suggestive of drug trafficking. Yet, by establishing a personal link between Gonzalez, Federico, and Van Buren, this evidence significantly reduced the possibility that the anonymous telephone activity between Gonzalez's residence and Van Buren's might have involved a third party other than Van Buren; by the same token the evidence substantially lessened the possibility that the police were misreading the apparent significance of the calls from Gonzalez to Van Buren.

Viewing the totality of the evidence in a reasonable and common sense manner, we believe that Judge Carlson could properly find probable cause to believe that Van Buren was actively engaged in an ongoing course of cocaine distribution. The remaining issue is whether the information given to Judge Carlson supports the further inference that evidence of Van Buren's misconduct would likely be found at his residence. *See generally Metler v. State,* 581 P.2d 669, 672–73 (Alaska 1978).

■ In the absence of direct observation, the nexus between a person who is engaged in criminal activity and the particular premises for which a warrant is sought may be established by consideration of factors such as the type of crime committed, the nature of the items sought, the suspect's opportunity to conceal those items, and the normal inferences as to where such items might be concealed. *Id.*

at 672; *State v. Conway,* 711 P.2d at 555, 557 (Alaska App.1985).

■ It is logical to assume that persons regularly engaged in illicit distribution of controlled substances will keep drugs, drug paraphernalia and related records in concealed places; absent contrary indications, the most likely place will be the place where those persons live. *See, e.g., State v. Conway,* 711 P.2d at 557; *Morrow v. State,* 704 P.2d 226, 230 (Alaska App.1985); *State v. Gutman,* 670 P.2d 1166, 1171 (Alaska App.1983); *Stuart v. State,* 698 P.2d 1218, 1221 (Alaska App.1985). *See also Snyder v. State,* 661 P.2d 638, 645–46 (Alaska App.1983).

■ In Van Buren's case, although there was evidence that Federico maintained multiple residences—a practice commonly used by drug dealers to minimize the risk of detection—there was no evidence suggesting that Van Buren maintained any place other than his residence where he could conceal drugs. Furthermore, evidence that a large number of recent calls were placed from Gonzalez's apartment to Van Buren's home strongly supports the inference that Van Buren conducted business at home. We believe that the nexus established to Van Buren's residence was sufficient in this case to support the issuance of the challenged warrant.

Accordingly, we conclude that the superior court did not err in denying Van Buren's motion to suppress.

Van Buren's conviction is AFFIRMED.

MANNHEIMER, J., not participating.