*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| DANIEL LUM and POLLY LUM, for themselves and for their minor children, JOSEPH AVEOGANNA, ELIZABETH HAWLEY, AIYANNA LUM, and JAMIE LUM, | ) ) ) ) ) | Supreme Court No. S-16057<br><br>Superior Court No. 2BA-07-00083 CI |
| Appellants, | ) ) | O P I N I O N |
| v. | ) ) | No. 7302 – September 21, 2018 |
| GWENDOLYN KOLES F/K/A GRIMES, JOSE GUTIERREZ, and NORTH SLOPE BOROUGH, | ) ) ) ) | |
| Appellees. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Second Judicial District, Barrow, Michael I. Jeffery, Judge.

Appearances: Colleen A. Libbey, Libbey Law Offices, Anchorage, for Appellants Daniel and Polly Lum. Lester K. Syren, Syren Law Offices, Anchorage, for Appellant Minor Children. Brent R. Cole, Law Office of Brent R. Cole, P.C., Anchorage, for Appellees Gwendolyn Koles and Jose Gutierrez. Peter C. Gamache, Law Office of Peter C. Gamache, Anchorage, for Appellee North Slope Borough.

Before: Stowers, Chief Justice, Winfree, Bolger, and Carney, Justices, and Eastaugh, Senior Justice.[*] [Maassen, Justice, not participating.]

CARNEY, Justice.
BOLGER, Justice, with whom STOWERS, Chief Justice, joins, dissenting.

## I. INTRODUCTION

The Lum family sued two police officers and the North Slope Borough for trespass and invasion of privacy after an allegedly unlawful entry into the Lums' home. The superior court dismissed both claims on summary judgment, reasoning that the officers were protected by qualified immunity under state law because the Lums had not produced sufficient evidence that the officers acted in bad faith. We reverse the superior court's decision because there are genuine issues of material fact as to whether they acted in bad faith.

## II. FACTS AND PROCEEDINGS

### A. Daniel Lum's Relationship With The Officers

In 2007 Daniel and Polly Lum and their children lived in Barrow. Officer Gwendolyn Grimes and Sergeant Jose Gutierrez were officers with the North Slope Borough Police Department.[1]

Daniel first met Grimes in her official capacity on August 22, 2007 after he reported that someone had stolen his methadone medication. Grimes responded to the call and met Daniel and Polly at their apartment. Grimes later said she "felt bad for [Daniel] that he was a junkie, methadone user." She knew that Daniel worked by driving tourists around in his van, and had referred people to his business. Grimes was

---

[*]    Sitting by assignment made under article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

[1]    Grimes has since married and changed her legal name to Gwendolyn Koles.

concerned that he might be driving under the influence of drugs, so she made a mental note to "keep an eye on him" while he was driving around town.

Daniel and Grimes met again in early September 2007 when they spoke about an incident purportedly involving a white man trying to abduct Native children. At that time Grimes was in her police vehicle and Daniel was on foot. Grimes later recalled that because the subject matter made Daniel visibly angry, she asked him "if everything was okay." Daniel remembered that she had asked what his problem was. Grimes recalled that Daniel then "just jumped down my throat and just started yelling and screaming at me," and said, "I'm not gonna talk to a meth dealer." In contrast Daniel said he told Grimes, "[M]y problem is your family is dealing meth in our village, that's my problem."

Grimes later said that she interpreted Daniel's response as an accusation that she was a meth dealer.[2] She said she did not pay much mind to Daniel's accusation, calling it "just . . . one of [his] ranting and ravings." She said that she quickly terminated the encounter. Daniel recalled her departure as less friendly: Grimes telling him, "[Y]ou go with that Daniel, I'll see you on the street. And that wasn't a see you later, buddy, that was I'll see you on the street. . . . I took it as a threat."

The following day Daniel was involved in a police chase ending at Point Barrow. When he reached the point and got out of his vehicle, he saw a police officer some distance away fire a gun in his direction. Daniel thought it was Grimes. He remained on the point until his negotiated surrender with the police.

---

[2]     Grimes explained that in the course of her work she got "a lot of crap from people on the street" regarding rumors of her dealing methamphetamine. She attributed the rumors to perceptions that the police, including her police chief father, were protecting her cousin, whom she admitted was a methamphetamine dealer.

Soon afterward Daniel began making accusations of police corruption. He spoke to the City of Barrow mayor about the incident at Point Barrow and attempted to speak to the North Slope Borough mayor. Grimes knew that there were accusations of police corruption but said that she did not know they were coming from Daniel.

Her colleague Gutierrez knew of Daniel and his tour business van. Gutierrez said that he knew "in general" that Daniel had been accusing police officers of being "dirty cops," but that he had no "direct knowledge" and knew only "scuttlebutt."

## B.    The Events Of September 18, 2007

About 8:00 p.m. on September 18 a dispatcher at the North Slope Borough Police Department received a 911 call from a woman who identified herself and stated that she was a friend of Polly Lum. She said that she wanted "some officers to go to [the Lums' apartment] for a welfare check on some children." She said she had heard the children "crying, and [a] newborn infant crying and two adults fighting and screaming." She had heard this when Polly called her on the phone for help. She also said that Daniel had told her that Polly had "bruises and a cut on her head."

The dispatcher reported to all units: "Female asking PD to do welfare check on couple as they were having a domestic dispute. Kids are crying, and she is concerned regarding kids' welfare at [the Lums' address]."

Grimes was on shift with Gutierrez and another officer. They were together on the scene of another call when they received the dispatcher's message and said they would respond to the call.

The officers' information was limited to what the dispatcher told them. They did not know the details of the 911 call. They did not therefore know the caller's identity or about Polly's reported injuries. Gutierrez later agreed that a dispatcher would normally inform the officers if she had reason to believe the call involved alcohol, weapons, or physical injury.

Gutierrez arrived on the scene first, followed shortly by Grimes. Grimes realized after arriving that the apartment was the Lums' because Daniel's van was parked outside. Both Grimes and Gutierrez turned on their audio recorders and walked toward the apartment. They did not speak to one another as they approached.

Gutierrez later testified he had heard "shouting" or "yelling" inside the home as he approached. Grimes testified she did not remember hearing anything as she approached the house but heard yelling inside the house once she was in front of the door. Their audio recordings do not offer definitive support for this claim. Footsteps can be heard on Gutierrez's recording as he approaches the apartment building, as well as what might be voices in the background; distortion makes it difficult to draw any conclusions. Grimes's recording is no clearer. The officers concede that any argument they might have heard is "not audible on the recordings." The Lums concede that they were arguing, but claim that by the time the police arrived they had moved their argument into the bathroom and had resumed speaking in normal voices.

Gutierrez knocked on the exterior door of the apartment building and a young girl, approximately six to eight years old, opened it. A barking dog stood with her in the hallway. The girl told the officers to come in. Gutierrez asked her where her parents were, and she responded "over there" pointing toward the interior door to the apartment. Gutierrez asked the child to "get him," meaning to "get a hold of the dog." The voices of a young girl and a young boy can then be heard on the recording attempting to introduce the officers to their dog, Mabel. The children's voices do not reveal any obvious signs of stress. The superior court's order noted that the children on the audio recording "did not sound stressed at the time."

Gutierrez opened the interior door and entered the apartment immediately after the children "got hold of the dog." Grimes followed. After entering, Grimes took

out her pepper spray. She later stated she did this because she was concerned the dog might bite the officers.

Neither officer announced their identity as police officers or their purpose. Gutierrez said this was because it was not required when police respond to a domestic dispute that they can hear in progress: "You kick the door in . . . if you deem it's an emergency." He explained that they did not send the children to fetch their parents, because "[t]hat would be putting the child at risk." Grimes said that they did not announce their presence because the argument that they heard outside the apartment created an "exigent circumstance" requiring their entry and investigation.

The officers entered the apartment and briefly looked into adjoining rooms before spotting Daniel, Polly, and an infant in the bathroom. Daniel did not know the police were there until he saw them from the bathroom. He told them to leave and accused Grimes of shooting at him, presumably referring to the earlier incident at Point Barrow.[3] The officers ordered him to come out of the bathroom. Daniel tried to slam the door shut, but Gutierrez used his shoulder to keep it open. Gutierrez and Daniel struggled over the door until it was open enough for Grimes to see Daniel; she then sprayed him with the pepper spray. Polly and their infant were hit with some of the spray.

Daniel started to feel like he was choking and unable to breathe. He repeatedly called out for an ambulance and said he was having a heart attack. The officers wrestled him out of the bathroom and put him in handcuffs. They then called an ambulance and one arrived about ten minutes later.[4]

---

[3]    Daniel later learned it had been another officer.

[4]    *Lum v. Koles*, 314 P.3d 546, 551 (Alaska 2013).

## C.    Proceedings

In December 2007 the Lums filed suit against the officers, alleging excessive force and unlawful entry under the Alaska Constitution and AS 12.25.100, Alaska's "knock and announce" statute.[5]  They also sued the North Slope Borough for negligent training and supervision.[6]  In 2010 the superior court granted summary judgment dismissing the Lums' excessive force claims on qualified immunity grounds and dismissing their unlawful entry claims because "neither could support a claim for damages."[7]  The court dismissed the Lums' claims against the Borough because the direct claims against the officers had been dismissed.[8]  The Lums had raised trespass and invasion of privacy claims for the first time in their opposition to summary judgment; the trial court had not considered those claims in granting summary judgment on the other claims.[9]

The Lums appealed, and in *Lum v. Koles* we affirmed the superior court's judgment on the excessive force and unlawful entry claims.[10]  But we remanded the

---

[5]     *Id.*; AS 12.25.100 ("A peace officer may break into a building or vessel in which the person to be arrested is or is believed to be, if the officer is refused admittance after the officer has announced the authority and purpose of the entry.").

[6]     *Lum*, 314 P.3d at 551.

[7]     *Id.* at 552.

[8]     *Id.*

[9]     *Id.* at 557.

[10]     *Id.* at 556, 557-59.  We affirmed the superior court's grant of summary judgment on the excessive force and unlawful entry claims because the use of force following an unlawful entry is not per se excessive force, and because the Lums sued under a provision of the Alaska Constitution which provides no cause of action to sue for damages for unlawful entry.  *Id.* at 555-57.

trespass and invasion of privacy claims to the superior court for further proceedings.[11]

In June 2014 the officers moved for summary judgment on those claims, arguing that qualified immunity protected them as it had against the excessive force claims and that the claims failed as a matter of law. The Lums argued that the officers' entry into their home was illegal and made in bad faith, that the officers therefore were not entitled to qualified immunity, and that summary judgment was not appropriate. They argued that the officers had fabricated their claim about hearing an argument before entering the apartment, and that Daniel's allegations that Grimes was a methamphetamine dealer, as well as Gutierrez's knowledge of Daniel's charges against the police department, supported an inference of malice. The officers countered that the evidence showed that they entered the Lums' home to investigate a report of domestic violence and that the information known to the 911 dispatcher should be imputed to them, which would support the legality of their entry.

The superior court granted the officers' motion for summary judgment, concluding that the officers were protected by qualified immunity. It reasoned that Gutierrez's general awareness of Daniel's police corruption claims was too speculative a basis for a reasonable inference of malice. The court acknowledged that Grimes presented a "closer issue," given her prior contacts with Daniel, and that viewing the evidence in the light most favorable to the Lums a jury might find that Grimes was "annoyed" with Daniel "because she assumed he was a significant person in spreading the rumor about her alleged meth dealing." Nonetheless the court determined that this evidence was insufficient because Grimes "faced . . . a report of a domestic dispute with kids crying, and her superior officer had already entered the inner part of the duplex." The court determined that there was insufficient evidence to support an inference of

---

[11]    *Id.* at 556-57.

malice against either officer, regardless of whether the 911 dispatcher's knowledge was imputed to them.  The Lums appeal.[12]

## III.   STANDARD OF REVIEW

"We review [a] grant of summary judgment de novo, reading the record in the light most favorable to the non-moving party and making all reasonable inferences in its favor."[13]  A grant of summary judgment will be affirmed "when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."[14]  "[T]he evidentiary threshold necessary to preclude the entry of summary judgment is low,"[15] but the evidence supporting a claim must not be "based entirely on 'unsupported assumptions and speculation' and must not be 'too incredible to be believed by reasonable minds.' "[16]

Whether official immunity applies is a question of law that we review de novo.[17]  But the existence of bad faith or malice on the part of police officers is generally a question of fact, and a disputed issue of malice will survive summary judgment where

---

[12]     The superior court dismissed the Lums' claims against the Borough as well, as those claims were dependent on their claims against the officers.

[13]     *Lum*, 314 P.3d at 552 (alteration in original) (quoting *Russell ex rel. J.N. v. Virg-In*, 258 P.3d 795, 801 (Alaska 2011)).

[14]     *Id.* (quoting *Russell*, 258 P.3d at 801-02).

[15]     *Crawford v. Kemp*, 139 P.3d 1249, 1253 (Alaska 2006) (quoting *Hammond v. State, Dep't of Transp. & Pub. Facilities*, 107 P.3d 871, 881 (Alaska 2005)).

[16]     *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 520 (Alaska 2014) (first quoting *Peterson v. State, Dep't of Nat. Res.*, 236 P.3d 355, 367 (Alaska 2010); and then quoting *Wilson v. Pollet*, 416 P.2d 381, 384 (Alaska 1966)).

[17]     *See Russell*, 258 P.3d at 802; *cf. Maness v. Daily*, 307 P.3d 894, 900 (Alaska 2013) (determining whether state official immunity applies is a question of law this court reviews de novo).

the record contains "at least some objective evidence establishing facts capable of supporting an inference of malice."[18]

## IV. DISCUSSION

### A. The Lums Have Produced Sufficient Evidence Of Bad Faith To Survive Summary Judgment On The Issue Of Qualified Immunity.

Alaska Statute 09.65.070(d)(2) grants municipal employees immunity from suits for damages based on the "exercise or performance or the failure to exercise or perform a discretionary function."[19] "Official immunity in Alaska is qualified . . . it applies only 'when discretionary acts within the scope of the official's authority are done in good faith and are not malicious or corrupt.' "[20] The issue here is whether there is evidence that the officers acted corruptly, maliciously, or in bad faith when they entered the Lums' home, and whether any such evidence is sufficient for the Lums' claims to survive summary judgment.

We have analyzed similar questions before in the context of state officials. In *Crawford v. Kemp* we reversed a superior court's grant of summary judgment in favor of a state trooper, because there was a genuine issue of material fact whether the defendant trooper had acted in bad faith; if he had acted in bad faith, those acts would not be shielded by qualified state law immunity.[21] Crawford had sued the trooper after

---

[18] *Prentzel v. State, Dep't of Pub. Safety*, 169 P.3d 573, 585 (Alaska 2007).

[19] *See* AS 01.10.060(a)(4) (defining "municipality" to include "a home rule . . . or general law borough"); *Malabed v. North Slope Borough*, 70 P.3d 416, 419 (Alaska 2003) (describing the North Slope Borough as a "home rule municipalit[y]").

[20] *Lane v. City & Borough of Juneau*, ___ P.3d ___, Op. No. 7328, 2018 WL 1977730 at *5 (Alaska Apr. 27, 2018) (quoting *Aspen Exporation Corp. v. Sheffiled*, 739 P.2d 150, 158 (Alaska 1987)).

[21] 139 P.3d 1249, 1258-59 (Alaska 2006).

the trooper arrested him for disorderly conduct in a courthouse clerk's office.[22] The trooper had approached Crawford while searching for another individual in the building.[23] Crawford grew annoyed and complained loudly about the trooper's questions and conduct.[24] The trooper warned Crawford "his speech was disorderly" and that he "would be arrested if he spoke again"; Crawford spoke and was arrested.[25] Several court employees testified that Crawford was "loud and disruptive," but Crawford testified otherwise and produced an affidavit from a friendly witness stating that both Crawford and the trooper had spoken in normal tones.[26] Considering the conflicting testimony, we held that there was a genuine issue of material fact whether the trooper reasonably believed he had probable cause for a disorderly conduct arrest and whether his "decision to arrest Crawford was made because he was annoyed with Crawford rather than because he had a good faith belief that the law had been violated."[27] We therefore reversed the superior court's judgment that the trooper enjoyed qualified immunity as a matter of law.[28]

Conversely, we upheld a qualified immunity determination in *Prentzel v. State, Department of Public Safety*, where the plaintiff's allegations of police malice

---

[22] *Id.* at 1251-52.

[23] *Id.* at 1251.

[24] *Id.* at 1251-52.

[25] *Id.* at 1252.

[26] *Id.*

[27] *Id.* at 1258-59.

[28] *Id.* at 1259.

consisted only of his own "subjective impressions."[29]  State troopers had mistakenly arrested Prentzel for violating conditions of release on bail — conditions to which he was no longer subject.[30]  Prentzel sued alleging the troopers had demonstrated bad faith because they "enjoy[ed] arresting [him]" and one trooper had "used a gleeful tone of voice when deciding to transport [him] to jail."[31]  We held that Prentzel's subjective beliefs found "no objective support from the facts in the record" and that he had failed to raise a genuine issue of material fact about the officer's alleged malice sufficient to survive summary judgment.[32]

We reached a similar conclusion in *Maness v. Daily*, where the plaintiff argued that there was a genuine issue of material fact whether the officers had pursued him in bad faith.[33]  The defendant officers had gone to Maness's home to execute a civil commitment order, but he armed himself and led the officers on an hours-long car chase and manhunt before he was shot and apprehended.[34]  He sued the officers for various torts, alleging that he had overcome their qualified immunity through proof of malice: for instance, the officers had claimed that he fired shots while fleeing in his RV, but their vehicles did not have any signs of gunshot damage, and other officers had not reported

---

[29]     169 P.3d 573, 585 (Alaska 2007).

[30]     *Id.* at 578.

[31]     *Id.* at 585.

[32]     *Id.* at 585-86.

[33]     307 P.3d 894, 904-05 (Alaska 2013).

[34]     *Id.* at 897-98.

shots fired.[35] We held that "these facts [did] not support an inference of malice even if viewed in the light most favorable to Maness," because of the abundance of evidence that "everything the troopers did . . . was aimed at effectuating" the lawful civil commitment order.[36]

The superior court here usefully framed the issue of officer malice: whether the Lums produced sufficient evidence that the officers entered their home with "a malicious desire to disturb [Daniel] beyond what was necessary as they responded to a report of the existence of a domestic dispute that caused children to be crying." We hold that the Lums have produced sufficient evidence of malice to overcome the low threshold to survive summary judgment.

We note first that, reading the record in the light most favorable to the Lums, as we must, there was little evidence on the scene that would have signaled to the officers that their entry was necessary to effect a lawful purpose. It is undisputed that the dispatch message requested a "welfare check" on a couple that was having a "domestic dispute," with kids crying at the scene. Although the officers have consistently claimed that they entered the home after hearing a loud argument inside, no such argument is audible in their recordings of the incident. Furthermore, the officers knocked on the exterior door and waited for it to be opened before they entered. And after knocking on the exterior door, the officers were greeted by children who showed no obvious signs of distress and whose primary concern appeared to be introducing the officers to their dog.

The Lums claim that at the time of the officers' arrival they were speaking at normal volumes. The Lums have presented evidence that the circumstances apparent to the officers when they arrived at the Lums' building and entered the Lum apartment

---

[35]     *Id.* at 904-05.

[36]     *Id.* at 905.

did not indicate that there was any emergency requiring their assistance, other than the message from dispatch reporting a "domestic dispute." The Lums' testimony, the audio recordings, and the officers' testimony reveal a genuine issue of material fact whether the officers heard "shouting" or "yelling" from inside the apartment. Unlike in *Maness* and *Prentzel*, we cannot say that there is "ample record evidence" that everything the officers did was aimed at effectuating a lawful emergency response.[37] Because "summary judgment is appropriate only when no reasonable person could discern a genuine factual dispute on a material issue" it was not appropriate here in light of the evidence presented.[38]

As in *Crawford*, where there was a genuine issue of material fact whether the officer arrested Crawford because he believed he had probable cause to arrest or because he was annoyed by Crawford, so here there is a genuine issue whether the officers were motivated by an apparent emergency or by their prior experiences with Daniel.[39] Both Gutierrez and Grimes knew Daniel, and both officers identified the apartment as his, either from past experience or from his distinctive van parked outside. Daniel had made public accusations of police corruption. Both officers were generally aware of the accusations and Gutierrez testified he knew the accusations were coming from Daniel. Daniel had personally confronted Grimes with accusations that her family was selling methamphetamine. Daniel's account of the confrontation with Grimes ended with the officer threatening him that she would "see [him] on the street." The officers entered Daniel's home less than three weeks later. It remains a question whether the officers entered the Lums' apartment without hearing or witnessing anything on the

---

[37] *See id.* at 905 (quoting *Prentzel*,169 P.3d at 585).

[38] *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 520 (Alaska 2014).

[39] *Crawford v. Kemp*, 139 P.3d 1249, 1258-59 (Alaska 2006).

scene indicating an emergency and whether their entry was for reasons other "than because [they] had a good faith belief" that their assistance was required inside.[40]

We reiterate that "the evidentiary threshold necessary to preclude an entry of summary judgment is low."[41]  Collectively, the evidence presented could support an inference that the officers' entry was motivated by "a malicious desire to disturb [Daniel] beyond what was necessary as they responded to a report of the existence of a domestic dispute."  The existence of bad faith therefore remains a genuine issue of material fact, and we cannot affirm the superior court's grant of summary judgment on this point.

B.    **The Officers Are Not Entitled To Judgment As A Matter Of Law On The Lums' Trespass And Invasion Of Privacy Claims**.

The officers urge us to affirm the superior court's grant of summary judgment.  They argue that the invasion of privacy claim is barred because they entered the Lums' home only in "the orderly performance of [their] duties," and that the trespass claim is barred because their entry was "privileged."[42]  We take these arguments to mean that the officers cannot be held liable under either tort theory because their entry was

---

[40]     *See id.*

[41]     *Hammond v. State, Dep't of Transp. & Pub. Facilities*, 107 P.3d 871, 881 (Alaska 2005) (quoting *John's Heating Serv. v. Lamb*, 46 P.3d 1024, 1032 (Alaska 2002)).

[42]     The Lums respond that the superior court did not rule on these arguments and the officers have waived them.  It is true that the superior court did not make any rulings beyond granting the officers qualified immunity.  But that does not mean the argument is waived.  "We are not bound by the reasoning articulated by the superior court and can affirm a grant of summary judgment on alternative grounds, including grounds not advanced by the superior court or the parties." *Hoffman Constr. Co. of Alaska v. U.S. Fabrication & Erection, Inc.*, 32 P.3d 346, 351 (Alaska 2001).  The officers raised this argument in their motion for summary judgment before the superior court, and the Lums responded to the argument in their opposition.  Both parties have briefed the issue on appeal.  The argument is not waived and we will consider it.

lawful.[43] But we cannot uphold judgment for the officers on this basis because determining the legality of their entry requires resolution of genuine issues of material fact.

We note first that the officers entered the Lums' apartment without a warrant. Both the United States and Alaska Constitutions prohibit "unreasonable searches and seizures."[44] "Under the Fourth Amendment of the United States Constitution 'searches and seizures inside a home without a warrant are presumptively unreasonable.' "[45] But "[u]nder the Alaska Constitution 'a search without a warrant is *per se* unreasonable unless it clearly falls within one of the narrowly defined exceptions to the warrant requirement.' "[46] This is because "[i]n Alaska we have . . . recognized the distinctive nature of the home as a place where the individual's privacy receives special protection"[47] and "[o]ur . . . state has traditionally been the home of people who prize their individuality and who have chosen to settle or to continue living here in order to

---

[43] *See* 87 C.J.S. *Trespass* § 54 (2018) ("Valid authority from the government . . . is a defense in trespass for authorized acts by authorized persons provided the scope of authority has not been exceeded."); 75 AM. JUR. 2D *Trespass* § 78 (2018) ("Law enforcement officers who enter premises without authority are subject to common law trespass actions, and trespass will lie for an unconstitutional entry."); *Greywolf v. Carroll*, 151 P.3d 1234, 1245 (Alaska 2007) (holding "the orderly performance of the police officers' duties" could not give rise to an invasion of privacy claim); *City of Nome v. Ailak*, 570 P.2d 162, 167 (Alaska 1977) (holding that police officers' "reasonable belief as to the existence of an emergency" justified unauthorized home entry and protected officers from liability for trespass).

[44] Alaska Const. art. I, § 14; U.S. CONST. amend. IV.

[45] *State v. Gibson*, 267 P.3d 645, 650-51 (Alaska 2012) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)).

[46] *Gibson*, 267 P.3d at 650-51 (emphasis added).

[47] *Ravin v. State*, 537 P.2d 494, 503 (Alaska 1975).

achieve a measure of control over their own lifestyles which is now virtually unattainable in many of our sister states."[48] We have "consistently recognized that the home is constitutionally protected from unreasonable searches and seizures, reasoning that the home itself retains a protected status under the Fourth Amendment and Alaska's [C]onstitution distinct from that of the occupant's person."[49]

As a result of the home's protected status, a warrant is required under Alaska law for entry; an officer must demonstrate probable cause to obtain a warrant.[50] Probable cause requires more than reasonable suspicion; it exists when "reliable information is set forth in sufficient detail to warrant a reasonably prudent [person] in believing that a crime has been or was being committed."[51] A limited number of narrowly defined exceptions to the warrant requirement have been recognized;[52] one of them is the emergency aid exception.[53]

---

[48]     *Id.* at 504.

[49]     *Id.* at 503 (citing *State v. Spietz*, 531 P.2d 521 (Alaska 1975); *Ferguson v. State*, 488 P.2d 1032, 1035 (Alaska 1971)).   *See* Alaska Const. art. I, §§ 14, 22 ("The right of the people to privacy is recognized and shall not be infringed . . . ."); *Gibson*, 267 P.3d at 659 (explaining "the Alaska Constitution . . . affords greater protection against warrantless search and seizures in the emergency aid context than the United States Constitution").

[50]     *Carter v. State*, 910 P.2d 619, 623 (Alaska 1996).

[51]     *Id.* (alteration in original) (quoting *Van Buren v. State*, 823 P.2d 1258, 1261 (Alaska App. 1992)).

[52]     Other exceptions that allow the warrantless entry into a home include when officers are in hot pursuit of a suspect, to prevent the imminent destruction of known evidence, and when effective consent to enter is given.  *Erickson v. State*, 507 P.2d 508, 515 (Alaska 1973).

[53]     *Gibson*, 267 P.3d at 658-60.

The officers here rely on the emergency aid exception, which allows a warrantless entry when three elements exist:

> (1) The police must have reasonable grounds to believe there is an emergency at hand and an immediate need for their assistance in the protection of life or property; (2) the search must not be primarily motivated by the intent to arrest a person or to seize evidence; and (3) there must be some reasonable basis, *approximating probable cause*, to associate the emergency with the area or place to be searched.[54]

We note this exception explicitly incorporates a threshold requirement approximating probable cause.

In analyzing the first element, "the criterion is the reasonableness of the belief as to the existence of an emergency, not the existence of an emergency in fact."[55] Reading the record in the light most favorable to the Lums, we conclude that there is a genuine issue of material fact whether the officers had reasonable grounds to believe that an emergency was at hand in the Lums' apartment. As we explained in the previous section, a reasonable person could conclude that there was no evidence of an emergency taking place in the Lums' residence beyond the 911 dispatcher's report of a domestic dispute.

The officers and the dissent, citing *State v. Miller*, argue that threats of domestic violence are no minor matter. We agree. We remain mindful "of the continuing problem of domestic violence, and the state's responsibility in protecting

---

[54]    *Id.* at 659 (emphasis added) (citing *Gallmeyer v. State*, 640 P.2d 837, 842 (Alaska App. 1982)).

[55]    *Id.* at 658 (alteration omitted) (quoting *Stevens v. State*, 443 P.2d 600, 605 (Alaska 1968) (Rabinowitz, J. concurring)).

against it."[56]

In *Miller* we held that a reported "verbal domestic dispute" in a parking lot could justify a "minimally intrusive" investigative stop of the fighting couple's vehicle.[57] An officer in Alaska may conduct an investigative stop "where the police officer has a reasonable suspicion that imminent public danger exists or serious harm to person or property has recently occurred."[58] Reasonable suspicion requires an officer to have "some minimal level of objective justification for making the stop."[59] "The objective justification must be 'something more than an inchoate and unparticularized suspicion or hunch.' "[60]

But to rule as the officers and the dissent suggest would create an exception to the warrant requirement whenever a dispatcher reports a domestic dispute at a given residential address, even when officers arrive and find no evidence that a dispute, much less a violent one, is taking place. It would also seem to create an exception to *Gibson*'s requirement of "a reasonable basis approximating probable cause" to believe that emergency entry into the residence is necessary.[61]

The officers argue further that the *dispatcher* had information — a description of Polly's alleged injuries — that would support a reasonable belief in the existence of an emergency, and that this knowledge should be imputed to them in

---

[56]     *State v. Miller*, 207 P.3d 541, 546 (Alaska 2009).

[57]     *Id*. at 547, 549-51.

[58]      *Coleman v. State*, 553 P.2d 40, 46 (Alaska 1976).

[59]     *Miller*, 207 P.3d at 544 (quoting *McQuade v. State*, 130 P.3d 973, 976-77 (Alaska App. 2006)).

[60]     *Id.* (quoting *McQuade*, 130 P.3d at 977).

[61]     *Gibson*, 267 P.3d at 659.

evaluating the legality of their entry. The dispatcher never transmitted this information to the responding officers, telling them only that there was a "domestic dispute" at the Lum address and relaying the caller's request for a welfare check. And Gutierrez later acknowledged that the dispatcher would normally tell the officers if a call involved physical injury — which was not done here. Officers Grimes and Gutierrez concede they never relied on the dispatcher's knowledge that the dispute potentially involved physical injury. They therefore cannot claim the benefit of it.[62]

The officers and the dissent point to cases where this court and others have imputed a dispatcher's knowledge to officers to justify traffic stops and defeat motions to suppress evidence obtained from the stop.[63] They ask us to allow her information to be imputed to them, citing cases from several federal and state courts. We find these decisions unpersuasive.[64] They are based upon the collective knowledge doctrine, which

---

[62]     Nor does the information known to the 911 dispatcher affect the qualified immunity analysis of the previous section. We have emphasized that, "[i]n analyzing qualified immunity questions we 'focus on the *officers'* perspectives and perceptions, as it is what reasonable officers *in their position* could have thought that is dispositive of this issue.' " *Lum v. Koles*, 314 P.3d 546, 553 (Alaska 2013) (quoting *Olson v. City of Hooper Bay*, 251 P.3d 1024, 1030 (Alaska 2011)).

[63]     *See Miller*, 207 P.3d at 548-49 (allowing dispatcher knowledge to support an officer's traffic stop); *see also United States v. Hensley*, 469 U.S. 221, 232 (1985) (holding that police-issued flyer can support investigative stop based on reasonable suspicion); *State v. Prater*, 958 P.2d 1110, 1113 (Alaska App. 1998) (holding dispatcher knowledge could provide reasonable suspicion for traffic stop).

[64]     We note that the cases on which the dissent relies themselves rest upon information that has been transmitted from one officer to another. *See, e.g., Schoolcraft v. City of New York,* 103 F. Supp. 3d 465, 502 (S.D.N.Y. 2015) ("The doctrine applies only where the officers are in communication, sharing information relevant to the determination of exigent circumstances."); *James v. Chavez,* 830 F. Supp. 2d 1208, 1261-2 (D.N.M. 2011) (recognizing that effective law enforcement requires that "police
(continued...)

allows police officers to act in reliance on another officer's knowledge to take action, even though the individual assisting officer lacks that knowledge.[65] This doctrine was recognized by the United States Supreme Court in *United States v. Hensley*.[66] There the Court approved the investigative stop of a vehicle by an officer who relied upon information from a wanted flyer issued by another police department.[67] Subsequent cases from federal and state courts have upheld similar stops, and a few federal circuits and state courts have suggested that it could be extended to support probable cause to enter a home, but neither the United States Supreme Court nor any federal circuit court or state supreme court has extended the doctrine to permit warrantless entry into a home.[68]

Demonstrating reasonable suspicion for an investigative stop requires significantly less than the probable cause needed to enter a home; we are not persuaded to dilute the probable cause necessary for a home entry by extending the collective knowledge doctrine to this context. While we approved the use of the collective knowledge doctrine in *State v. Miller*, that approval allowed an officer to rely upon

---

[64]  (...continued)
officers can act on directions and information transmitted by one officer to another.").

[65]  *Hensley*, 469 U.S. at 232.

[66]  *Id.*

[67]  *Id.* "Assuming the police make a *Terry* stop in objective reliance on a flyer or bulletin, we hold that the evidence uncovered in the course of the stop is admissible if the police who *issued* the flyer or bulletin possessed a reasonable suspicion justifying a stop, and if the stop that in fact occurred was not significantly more intrusive than would have been permitted the issuing department." *Id.* at 233.

[68]  *See United States v. Russell*, 436 F.3d 1086, 1095 (9th Cir. 2006) (Thomas, J., Concurring); *Schoolcraft v. City of New York*, 103 F. Supp. 3d 465, 502 (S.D.N.Y. 2015); *United States v. Christy*, 810 F. Supp. 2d 1219, 1260-62 (D.N.M. 2011).

information imputed from a dispatcher to meet the reasonable suspicion requirement for an investigative stop of a vehicle.[69]

The investigative stop of a vehicle differs fundamentally from an entry into a home; the reasonable suspicion needed for an investigative stop is a substantially lower showing than the one required for probable cause.[70] In order to enter a home without a warrant under the emergency aid exception, the officers must satisfy all of the exception's requirements, and each requirement specifically refers to the responding officer's reasonable belief.[71] Thus, when they arrived at the Lums' home, Grimes and Gutierrez needed to observe circumstances that provided corroboration approaching probable cause that an ongoing emergency existed before they could enter the home without a warrant.[72] The dispatcher's undisclosed knowledge of the details of the 911 call did not provide any information about the situation at the home when the officers arrived; her information may not be imputed to them for the purpose of meeting the requirements of the emergency aid exception. Further, allowing the dispatcher's information to be imputed to justify the warrantless entry into a home appears to be at

---

[69]     *Miller*, 207 P.3d at 547-50.

[70]     *See Navarette v. California*, 134 S.Ct. 1683, 1687 (2014) ("Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion [required for reasonable suspicion] is . . . 'obviously less' than is necessary for probable cause." (first quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968) then quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)); *State v. Moran*, 667 P.2d 734, 735-36 (Alaska App. 1983) (differentiating "quantum of information" an officer must have for reasonable suspicion as lower than that for probable cause).

[71]     *State v. Gibson*, 267 P.3d 645, 659, 667 (Alaska 2012).

[72]     *Id.* at 659, 662-67.

odds with the strong privacy protections provided by the Alaska Constitution.[73]  We decline the officers' invitation to impute the dispatcher's knowledge to them in this different arena on the facts of this case.

Whether the officers' entry into the Lums' home was legal depends on the resolution of genuine issues of material fact.  The officers and the Borough are therefore not entitled to summary judgment on the Lums' trespass and invasion of privacy claims.

## V.     CONCLUSION

We REVERSE the superior court's grant of summary judgment in favor of the officers and the Borough and REMAND this case for further proceedings consistent with this opinion.

---

[73]     *See Ravin*, 537 P.2d at 503-04.

BOLGER, Justice, with whom STOWERS, Chief Justice, joins, dissenting.

The court's opinion complicates the police response to domestic violence situations by limiting a court's consideration of a victim's report conveyed to a police dispatcher. Ignoring this information endangers some of the most vulnerable victims: those whose pleas are silenced by threats or violence. The court offers no persuasive reason to restrict the use of this information when assessing whether the police have acted lawfully in responding to a domestic violence emergency.

Polly Lum called her best friend for help because she was in a fight with her husband, Daniel Lum. During the call, Daniel told Polly's friend that Polly had suffered bruises and a cut on her head. Polly's friend relayed this information to the police dispatcher and asked for police officers to go to the Lums' residence for a welfare check.

Based on this call, the superior court concluded that Sergeant Gutierrez was justified in entering the Lums' residence to render emergency aid and that Officer Grimes was justified in following. These conclusions are well supported by our prior case law.

In *State v. Gibson*, we recognized that the police may enter a residence without a warrant when they have "reasonable grounds to believe there is an emergency at hand and an immediate need for their assistance."[1] These grounds are established when the police have good reason to believe there might be someone injured in the premises.[2] Here, the police collectively had good reason to believe that Polly had been injured based on the call from Polly's friend. Therefore, the officers were privileged to

_____

[1]    267 P.3d 645, 659 (Alaska 2012).

[2]    *Id*. at 664.

enter the premises to protect Polly from further injury. This privilege protects the officers from liability to the Lums for trespass[3] or breach of privacy.[4]

The court refuses to consider Polly's friend's call to the dispatcher in deciding whether the officers' entry was legal and reasonable. This refusal contravenes persuasive precedent from this jurisdiction and across the nation.

In *State v. Miller*, we relied on the information included in an anonymous 911 call to support an officer's decision to stop a couple suspected of domestic violence.[5] This conclusion was consistent with the larger principle that the police are " 'entitled to act' upon the strength of a communication through official channels directing or requesting that an arrest or search be made."[6] For example,

> when evidence is uncovered during a search incident to an arrest in reliance merely on a flyer or bulletin, its admissibility turns on whether the officers who issued the flyer possessed probable cause to make the arrest. It does not

---

[3] *See City of Nome v. Ailak*, 570 P.2d 162, 167 (Alaska 1977) (holding that police officers could not be liable for trespass because they "had a reasonable belief as to the existence of an emergency which justified their unauthorized entry").

[4] *See Greywolf v. Carroll*, 151 P.3d 1234, 1245 (Alaska 2007) (holding that "the invasion of privacy principle cannot shield a person from [an] investigation[] by the police unless the investigation is carried out in an offensive manner").

[5] 207 P.3d 541, 547-49 (Alaska 2009); *see id.* at 548 ("[R]elevant information known to a police dispatcher may be 'imputed' to a police officer who conducts an investigative stop and so may be considered for purposes of evaluating whether the stop was supported by a reasonable suspicion." (quoting *State v. Prater*, 958 P.2d 1110, 1110 (Alaska App. 1998))).

[6] 2 WAYNE R. LAFAVE, SEARCH & SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 3.5(b), at 338 (5th ed. 2012) (quoting *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 568 (1971)); *see also Mattern v. State*, 500 P.2d 228, 232-33 (Alaska 1972) (relying on information conveyed to a police dispatcher to justify a warrantless arrest).

turn on whether those relying on the flyer were themselves aware of the specific facts which led their colleagues to seek their assistance.[7]

The Alaska Court of Appeals has relied on the collective knowledge doctrine to analyze both the reasonable suspicion supporting a traffic stop[8] and the probable cause supporting a warrantless search.[9] Likewise, other courts considering the question have held that the collective knowledge of fellow officers should be considered to determine whether an entry is justified by exigent circumstances, such as a need for emergency aid.[10]

---

[7]    *United States v. Hensley*, 469 U.S. 221, 231 (1985).

[8]    *State v. Prater*, 958 P.2d 1110, 1113 (Alaska App. 1998) (stating that "an investigative stop made in objective reliance on a police dispatcher's bulletin is justified if the dispatcher who broadcast the bulletin possessed reasonable suspicion of imminent public danger justifying the stop").

[9]    *Chandler v. State*, 830 P.2d 789, 792 (Alaska App. 1992) (stating that "the collective knowledge of the officers participating in the case may be considered in determining probable cause"); *see generally* 22 C.J.S. *Criminal Procedure and Rights of Accused* § 78 (2018); 79 C.J.S. *Searches and Seizures* § 71 (2018).

[10]    *See Schoolcraft v. City of New York*, 103 F. Supp. 3d 465, 502 (S.D.N.Y.) ("[T]he collective knowledge doctrine may be applied to exigent circumstance analysis, just as it applied to warrantless searches and seizures."), *reconsideration granted in part*, 133 F. Supp. 3d 563 (S.D.N.Y. 2015); *James v. Chavez*, 830 F. Supp. 2d 1208, 1260-62 (D.N.M. 2011) ("[T]he collective-knowledge doctrine can be used to impute knowledge of exigent circumstances."), *aff'd*, 511 F. App'x 742 (10th Cir. 2013); *United States v. Christy*, 810 F. Supp. 2d 1219, 1261-63 (D.N.M. 2011) (same), *aff'd*, 739 F.3d 534 (10th Cir. 2014); *Stricker v. Cambridge Twp.*, No. 10-14424, 2011 WL 3319727, at *17 (E.D. Mich. Aug. 1, 2011) (concluding that police officers "were entitled to rely on their collective knowledge" in deciding to enter residence to provide aid to overdose victim), *aff'd sub nom. Stricker v. Twp. of Cambridge*, 710 F.3d 350 (6th Cir. 2013); *Mitchell v.*
(continued...)

The court's opinion downplays the importance of Polly's friend's report to the dispatcher, noting that the record, construed in the light most favorable to the Lums, indicates that the officers did not see or hear a domestic dispute when they arrived at the Lums' residence. But we have recognized the danger that such reasoning invites.[11] In *Miller* we cited statistics on domestic violence in Alaska and the nation:

> A study issued in September 2005 ranked Alaska first in the nation for the rate of intimate partner violence ending in homicide. Nationally, for homicides in which the victim-to-offender relationship could be identified, ninety-two percent of female victims were murdered by someone they knew, and

---

[10]     (...continued)
*State*, 742 S.W.2d 895, 898-99 (Ark. 1988) ("Regardless of what [the police officer] personally knew, he is charged with the collective knowledge of the police department at the time [of the emergency aid search]."); *Evans v. United States*, 122 A.3d 876, 881-82 (D.C. 2015) (considering whether collective knowledge of responding officers justified an emergency aid search); *Oliver v. United States*, 656 A.2d 1159, 1166-67 & n.14 (D.C. 1995) (reasoning that information in police case file should be imputed to officers in assessing whether they had reasonable grounds to believe there was an emergency); *People v. Nichols*, 964 N.E.2d 1190, 1208 (Ill. App. 2012) (stating that "it is the *collective* knowledge of the officers that is the criterion" when addressing whether exigent circumstances exist (emphasis in original)); *State v. Lemieux*, 726 N.W.2d 783, 789 (Minn. 2007) ("When assessing the reasonableness of an emergency-aid search, the officer who conducts the search is imputed with knowledge of all facts known by other officers involved in the investigation . . . ."); *see also United States v. Russell*, 436 F.3d 1086, 1094-95 (9th Cir. 2006) (Thomas, J., concurring in part and dissenting in part) ("We analyze the 'reasonable grounds to believe that there is an emergency at hand,' on an objective basis, taking into consideration the collective knowledge of the officers at the time." (quoting *United States v. Cervantes*, 219 F.3d 882, 888 (9th Cir. 2000), *overruled on other grounds by Brigham City v. Stuart*, 547 U.S. 398 (2006))).

[11]     *See State v. Miller*, 207 P.3d 541, 545 (Alaska 2009) (noting "the danger that a report of a verbal domestic dispute portends"). Polly's friend's call indicated that the dispute in this case had already escalated to violence.

sixty-two percent were killed by husbands, ex-husbands, or boyfriends.[12]

Requiring responding police officers to develop independent knowledge about an emergency may reward an attacker who can use violence or threats to silence his victim. And disregarding the collective knowledge doctrine may thus hamstring the police response to a serious emergency.

In my opinion, we should apply the collective knowledge doctrine to this case: we should consider the call from Polly's best friend to determine whether the responding officers acted reasonably. Considering this call, the superior court properly concluded that the emergency aid doctrine authorized the officers to enter the residence to prevent further injury to Polly Lum. I would affirm the superior court's decision to dismiss the Lums' claims for trespass and breach of privacy.

---

[12] *Id.* (footnote omitted). Alaska has continued to have the highest rate of homicides involving female victims and male perpetrators, according to a more recent edition of the report cited in *Miller*. *See* VIOLENCE POLICY CTR., WHEN MEN MURDER WOMEN: AN ANALYSIS OF 2015 HOMICIDE DATA 4 (2017), http://www.vpc.org/studies/wmmw2017.pdf. In 2015 all of Alaska's female homicide victims were killed by male perpetrators whom they knew; 60 percent were killed by an intimate partner or former intimate partner. *Id.* at 11.